Martha THOMASON, Plaintiff,

v.

**PRUDENTIAL INSURANCE COMPANY OF AMERICA and Dwight E. Keefer, Defendants.**

No. 93–4150–SAC.

United States District Court, D. Kansas.

Oct. 28, 1994.

Dan E. Turner, Phillip L. Turner, Turner Law Office, Topeka, KS, for plaintiff.

Grant M. Glenn, R. Patrick Riordan, Woner, Glenn, Reeder, Lowry & Girard, Topeka, KS, for defendant Prudential Ins. Co. of America.

Deanne W. Hay, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, Stephen W. Nichols, Arthur H. Stoup & Associates, P.C., Kansas City, MO, for defendant Dwight E. Keefer.

## MEMORANDUM AND ORDER

CROW, District Judge.

In this case, Martha Thomason alleges that while she was an employee of the Prudential Insurance Company of America (Prudential) she was subjected to sexual harassment by her supervisor, Dwight E. Keefer. In addition, the plaintiff alleges that Keefer "made disparaging remarks and comments concerning [her] religion." In her third amended complaint, Thomason seeks compensation under the following legal theories:

Count I: Violation of 42 U.S.C. § 2000e–2(a)(1) (Title VII)

Count II: Violation of the Kansas Act Against Discrimination (KAAD), K.S.A. 44–1001, et seq.

Count III: Tort of Outrage (based upon her termination for refusing to have sexual relations with Keefer)

Count IV: Breach of an implied contract of employment[1]

Count V: Breach of an employment contract to pay withholding taxes, overtime pay, medical benefits and retirement benefits.[2]

Count VI: Tort of outrage (based upon Keefer's behavior in the workplace toward Thomason)

See (Dk. 93). Thomason's complaint alleges jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity of citizenship), and 28 U.S.C. § 1343 (civil rights and elective franchise), as well as state supplemental claims. See 28 U.S.C. § 1367.

This case comes before the court upon Prudential's motion for summary judgment (Dk. 144) and upon Dwight E. Keefer's motion for partial summary judgment (Dk. 146). Thomason has filed a response to each defendant's motion, and each defendant has filed a reply. At the heart of the defendant's respective motion for summary judgment is their contention that Keefer was not an employee of Prudential, but instead that he was merely an independent contractor.[3] The issue is significant for different reasons for each defendant. For Prudential, the issue is significant in that (1) it would not be liable for the acts of a person who was not its employee and (2) if Keefer was not an employee of Prudential, then Thomason cannot demonstrate that she was a Prudential employee, and hence she cannot recover from it under any of her discrimination claims. For Keefer, the issue is significant as he would not be an "employer" within the meaning of 42 U.S.C. § 2000e(b) or K.S.A. 44–1002(b) unless he was an employee of Prudential, as Keefer did not otherwise employ the statutory number of employees necessary to qualify as an "employer." Prudential seeks summary judgment on all of the plaintiff's other claims. While Keefer concedes that a genuine issue of material fact exists concerning one portion of the plaintiff's claims, Keefer contends that he is entitled to summary

---

1. In her response to each of the defendants' motions for summary judgment, Thomason withdraws Count IV. See Dk. 156 at page 26; Dk. 158 at page 25.

2. In Thomason's responses to each of the defendant's motions for summary judgment, the plaintiff concedes that she suffered no damages based upon the failure of the defendants to provide health and retirement benefits. See Dk. 156 at pages 26–27; Dk. 158 at page 26. However, Thomason continues to assert her claims for damages resulting from the defendants' failure to pay withholding taxes and to compensate her for overtime. Keefer concedes that these particular claims are not amenable to disposition by summary judgment.

3. In *Falls v. Scott*, 249 Kan. 54, 815 P.2d 1104 (1991), the Supreme Court of Kansas explained the distinction between an employee and an independent contractor:

An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work. The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor. *Wallis v. Secretary of Kans. Dept. of Human Resources*, 236 Kan. 97, Syl. ¶¶ 3, 5, 689 P.2d 787 (1984).
249 Kan. at 64, 815 P.2d 1104.

judgment on the balance of the plaintiff's other claims.

Thomason responds, arguing genuine issues of material fact concerning Keefer's relationship to Prudential and her relationship to Prudential precludes summary judgment on her remaining claims. Thomason also argues that her claims based upon the tort of outrage should survive summary judgment.

The court, having considered the briefs of counsel and the applicable law, is now prepared to rule.

### Standards for Summary Judgment

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." ' " *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin*, 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings); *see also Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.*, 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## Uncontroverted Facts [4]

From 1990 to present, Keefer has been the owner and operator of a sole proprietorship doing business as "Dwight E. Keefer and Associates." Keefer performs estate, charitable tax, and financial planning for clients. Keefer sells and services certain insurance products underwritten by various insurance companies, one of which is Prudential. On or about January 8, 1990, Keefer entered into a Professions Agent Transitional Contract with Prudential. Section 6.(f) of that agreement expressly created an employer-employee relationship between Keefer and Prudential. On or about January 28, 1991, Keefer and Prudential executed a written amendment to the January 8, 1990, agreement. In pertinent part, that agreement provides:

> **Section 6. (f). Independent Contractor**—It is the intention of the parties that the Agent be an independent contractor and not an employee of the Company. The Agent shall make every reasonable effort to function as a full time life insurance salesperson for the Company within the meaning of Section 3121 of the Internal Revenue code of 1954 as it may be amended from time to time. None of the terms of this Contract shall be construed as creating a common-law employer-employee relationship.

On or about March 19, 1991, Keefer was informed by Prudential that he was qualified for Prudential's Service Support Program (SSP). The SSP program provides expense allowance payments to Keefer. The amount of the expense allowance is based upon Keefer's sales record. Prudential does not specifically direct the manner in which the expense allowance payments may be used for any particular type of business expense.

Keefer did not receive a salary from Prudential. Instead, Keefer received compensation in the form of commissions from the sale of Prudential insurance products. During the relevant time frame, Keefer rented office space for his business from Prudential. Keefer's office was located in a suite of the Prudential Offices in Overland Park. Keefer provided most of his own equipment, furnishings and expenses. Keefer has taken vacations whenever he deemed appropriate. Keefer has worked under his own schedule, his work has not been supervised by Prudential, and he has not been required to report his daily activities to Prudential. Keefer has received no unemployment benefits coverage or worker's compensation coverage from Prudential. Keefer has also been an agent for The New England Insurance Company and a broker for the Provident Life Accident Insurance Company. On his income tax forms for the relevant years, Keefer declared the income he received from Prudential and the other insurance companies as income derived from the operation of Dwight E. Keefer and Associates, and not as an income as an employee of any insurance company.[5]

In June of 1991, Keefer hired Thomason as an administrative assistant. Keefer believed that Thomason was working for him as an independent contractor; conversely, Thomason believed that she was working for Prudential. Thomason worked for Keefer until she was terminated by Keefer in January of 1992. During the time Thomason was employed by Keefer, she was paid by checks drawn on the account of "Dwight Keefer Revocable Trust." Thomason's 1991 tax return lists "Dwight Keefer and Associates" as a source of income.

During the time Thomason worked for Keefer, she was subjected to a wide variety

---

4. Although the court has given careful consideration to all of the materials submitted by the parties, the court will make no effort to systematically address each and every point raised by the parties. This memorandum and order will simply summarize the key aspects of the facts critical for deciding the pending motions. The court has also reviewed Keefer's affidavit and concludes, contrary to the plaintiff's suggestion, that his affidavit essentially satisfies the requirements of Fed.R.Civ.P. 56(e) and D.Kan. Rule 206(c).

5. Thomason argues that the defendants should not be entitled to rely on the financial information they refused to produce during discovery. The plaintiff does not demonstrate that she pursued this matter through a motion to compel or otherwise exhaust the available means of obtaining the discovery requested. Nor has the plaintiff submitted an affidavit in compliance with Fed.R.Civ.P. 56(f). Based upon these facts, the court will consider the materials submitted by the defendants on this issue.

of statements and conduct constituting sexual and religious harassment. On two occasions Keefer "bumped" into Thomason while she was at the refrigerator in the office. Keefer repeatedly used the word "Fuck." [6] While at a restaurant, Keefer once indicated to Thomason and another person with them that if he, meaning Keefer, got rid of his girlfriend, "where would he get a good fuck?"

Keefer repeatedly commented on Thomason's copious breasts. Keefer kissed Thomason on two occasions. On one occasion, Keefer pinched Thomason's breast while walking down a hallway. Keefer also grabbed Thomason's rear on another occasion.

In short, Thomason believed that Keefer's unwanted advances were part of his calculated attempt to have sex with her, and that if she did not accept those advances, she would be terminated.

In addition to sexual harassment, Keefer also committed acts which would likely constitute harassment on the basis of religion. Keefer repeatedly called Thomason, who was studying to convert to Catholicism, a "fish eater" and stated that Catholics are not Christians because they pray to "Mary." Keefer indicated that Catholicism is a "stupid" religion. In addition, during a staff office meeting, Keefer held a prayer meeting. Keefer conducted the prayer and discussed the presence of the devil in the office. Keefer indicated that presence of the devil needed to be removed. On one occasion, Keefer marked crosses on the doors of every office at Prudential with oil in an apparent effort to ward off evil.

Prior to her termination by Keefer, John Taylor, Manager, Manpower Development, and Registered Representative of Prudential, called Thomason to let her know that she was being terminated. Taylor also offered to write a letter of reference. In response to Thomason's request, Taylor prepared a letter of reference on her behalf. A copy of that letter is attached as Exhibit A to this memorandum and order.

Thomason's resume, prepared after her termination by Keefer, does not list Prudential as having been her employer. Instead, Thomason lists "Dwight E. Keefer & Assoc." as her employer in 1991 and 1992.

## Counts I and II: Title VII and KAAD Claims

■ Under Title VII, "employers" are prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). An "employer" under Title VII is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person ..." 42 U.S.C. § 2000e(b). An "employee" is "an individual employed by an employer." 42 U.S.C. § 2000e(f). Under the Kansas Act Against Discrimination (KAAD), the term "employer" means "any person in this state employing four or more persons." K.S.A. 44–1002.[7]

As a necessary predicate to prevailing on a Title VII or the KAAD claim, the plaintiff must demonstrate that the defendant is an

---

**6.** Keefer's actions and statements were not directed solely toward Thomason. Keefer once asked a female Prudential employee named Michelle Bochroy if she had "ever played hide the salami."

**7.** Thomason does not controvert the defendants' contention that the analysis applicable to determining the existence of an employer-employee relationship under Title VII is also relevant for determining the existence of an employer-employee relationship under the KAAD. While federal court decisions concerning Title VII are not controlling on the Kansas Supreme Court, *Harder v. Kansas Comm'n on Civil Rights*, 225 Kan.

556, 559, 592 P.2d 456 (1979), they are persuasive authority. *McCabe v. Board of Johnson County Comm'rs*, 5 Kan.App.2d 232, 235, 615 P.2d 780 (1980). " 'Especially is this true when they concern general law in the field of civil rights.' " *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 274, 864 P.2d 1148 (1993) (quoting *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 767, 648 P.2d 234 (1982)). *See Best v. State Farm Mut. Auto. Ins. Co.*, 953 F.2d 1477, 1480 n. 2 (10th Cir.1991). In light of the plaintiff's tacit concession, the court's Title VII analysis is equally applicable to the plaintiff's KAAD claims.

"employer" within the meaning of the respective statutes. *See Deal v. State Farm County Mut. Ins. Co. of Texas,* 5 F.3d 117, 118 (5th Cir.1993) (affirming district court's order dismissing plaintiffs Title VII and ADEA claims for lack of jurisdiction; defendants were not "employers" within the meaning of Title VII or ADEA).[8] Thomason concedes that she cannot prevail against the defendants on her discrimination claims unless she can demonstrate the existence of an employer-employee relationship with Prudential. As Thomason served as Keefer's administrative assistant, she cannot prevail against Prudential or Keefer if Keefer was not an agent of Prudential within the meaning of Title VII. *See Deal,* 5 F.3d at 118–119 (insurance company is not the employer of an individual who works for an independent insurance agent).

In *Oestman v. National Farmers Union Ins. Co.,* 958 F.2d 303 (10th Cir.1992),[9] the plaintiff appealed the district court's determination that he was not an employee within the meaning of the ADEA, but was instead an independent contractor. The Tenth Circuit affirmed the district court based upon the following analysis:

> Courts attempting to distinguish between employees and independent contractors for the purposes of interpreting federal anti-discrimination legislation have developed two primary tests: the economic realities test and the hybrid test. *See Mares v. Marsh,* 777 F.2d 1066, 1067 (5th Cir.); *E.E.O.C. v. Zippo Mfg. Co.,* 713 F.2d 32, 36–37 (3d Cir.). Under the economic realities test the central question becomes: Is this worker, as a matter of economic fact, in business for himself? *See Doty v. Elias,* 733 F.2d 720, 723 (10th Cir.). This test is most often applied to cases arising under the Fair Labor Standards Act

(FLSA), 29 U.S.C. 201 *et seq. Zippo,* 713 F.2d at 36.

> The hybrid test, which is most often applied to actions under Title VII, is a combination of the economic realities test and the common law right to control test. *Id.* at 37. Although the hybrid test looks at the economic realities of the situation, the focus of the inquiry is the employer's right to control the "means and manner" of the worker's performance. *Spirides v. Reinhardt,* 198 U.S.App.D.C. 93, 613 F.2d 826, 831 (D.C.Cir.). Other factors considered by courts applying the hybrid test are:

> "(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties."

> *Id.* 613 F.2d at 832.

> The question of whether an insurance agent is an employee or an independent contractor under ADEA is one of first impression in this circuit. In *Wheeler v. Hurdman,* 825 F.2d 257 (10th Cir.), we examined the issue of whether partners in

---

8. "Determining whether a defendant is an 'employer' under Title VII or the ADEA involves a two-step process. First, the defendant must fall within the statutory definition. Second, there must be an employment relationship between the plaintiff and the defendant." *Deal,* 5 F.3d at 118 n. 2.

9. The ADEA and Title VII define the term "employer" similarly. The ADEA defines employer as "a person ... who has twenty or more em-

ployees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year [and] any agent of such a person." 29 U.S.C. § 630(b). In general, cases construing definitions of terms in the ADEA are persuasive authority for interpreting the definition of terms in Title VII. *See Wheeler v. Hurdman,* 825 F.2d 257, 263 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987); *see, e.g., Deal,* 5 F.3d at 118.

an accounting firm were employees for purposes of Title VII, ADEA, and FLSA. After an extensive review of the statutes and case law, we held that the unique nature of partnerships precluded the use of either the economic realities test or the control test. *Id.* at 276. However, because our holding in *Wheeler* was based on the unique characteristics of a partnership, it does not foreclose the application of these tests in other ADEA cases. The present case warrants such an application.

We hold that the correct standard for determining whether an insurance agent is an employee under ADEA is the hybrid test. In *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), the Supreme Court explained that the ADEA is a hybrid of the FLSA and Title VII. The Third Circuit explained further in *Zippo:*

> "The Court found that Congress 'intended to incorporate fully the remedies and procedures of the FLSA.' Thus, ADEA's scope for purposes of procedure and remedies is determined by FLSA. However, the substantive 'prohibitions of the ADEA were derived in haec verba from Title VII.' Therefore, the scope of its substantive prohibition of discrimination in employment is determined by Title VII. The determination of employee status is a question relating to the substantive prohibitions of ADEA and not to its remedies and procedures. Consequently, the hybrid standard that combines the common law 'right to control' with the 'economic realities' as applied in Title VII cases is the correct standard for determining employee status under ADEA."

713 F.2d at 38 (citations omitted).

In applying the hybrid test no single factor is conclusive. Rather, the court must look at the totality of circumstances surrounding the working relationship between the parties. *See Spirides,* 613 F.2d at 831. The facts in the present case, taken as a whole, lead us to the conclusion that [the plaintiff] was an independent contractor and not an employee under ADEA.

The focus of the hybrid test is the employer's right to control the "means and manner" of the worker's performance. *Id.* In this case, Appellant's performance was subject to virtually no restrictions. Appellant's daily activities were not supervised and he was free to work as he chose. Appellant was not required to report to his office or to spend certain hours in pursuit of sales.

Other aspects of the relationship between the parties also lead to the conclusion that Appellant was an independent contractor instead of an employee. Appellant furnished his own office space and equipment. He was free to take a vacation whenever he deemed appropriate. In addition to being paid by commission, Appellees did not withhold taxes from [the plaintiff's] pay and did not pay social security taxes for him.

958 F.2d at 305–306.

The parties essentially agree that this is the proper test for determining whether an individual is an employee within the meaning of Title VII. Prudential, however, suggests that the Supreme Court's decision in *Nationwide Mut. Ins. Co. v. Darden,* — U.S. —, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), would possibly convince the Tenth Circuit to apply the "narrower" common law agency test for determining the existence of an employment relationship under federal discrimination law. In *Darden,* the Supreme Court considered the proper definition of the word "employee" as it appears in § 3(6) of the Employee Retirement Income Security Act of 1974 (ERISA). The Supreme Court concluded that where a statute containing the term "employee" does not "helpfully" define the word, that the word should be construed under the usual common law agency rules applicable for determining the employer-employee relationship. — U.S. —, 112 S.Ct. at 1348–49, 117 L.Ed.2d at 589–590.

In *Darden,* the Supreme Court summarized the common-law test as follows:

> "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.

Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

—— U.S. at ——, 112 S.Ct. at 1348, 117 L.Ed.2d at 589–590 (*quoting Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–752, 109 S.Ct. 2166, 2178–2179, 104 L.Ed.2d 811 (1989) (footnotes omitted) (citations omitted)). "Since the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Darden,* —— U.S. at ——, 112 S.Ct. at 1349, 117 L.Ed.2d at 590 (*quoting NLRB v. United Ins. Co. of America,* 390 U.S. 254, 258, 88 S.Ct. 988, 990–91, 19 L.Ed.2d 1083 (1968)).

In *Frankel v. Bally, Inc.,* 987 F.2d 86, 90 (2nd Cir.1993), the court of appeals, relying on the Supreme Court's analysis in *Darden,* held that the "question of whether an individual is an 'employee' or an 'independent contractor' within the meaning of the ADEA must be determined in accordance with common law agency principles."

Although *Oestman* was decided before the Supreme Court's decision in *Darden,* the court notes that the Tenth Circuit, in an unpublished decision decided after the Supreme Court's decision in *Darden,* again applied the hybrid approach adopted in *Oestman. See Whiles v. City & Cty. of Denver,* No. 93–1041, 1993 WL 413679, 1993 U.S.App. LEXIS 27249 (10th Cir. October 18, 1993). In *Whiles,* the Tenth Circuit affirmed the district court's order finding that the plaintiff was an independent contractor rather than an employee within the meaning of the ADEA.

Because all of the parties essentially agree that the court should utilize the hybrid approach in analyzing this issue, and because the approach is similar to the "common law test," *see Wilde v. County of Kandiyohi,* 15 F.3d 103, 106 (8th Cir.1994) ("We see no significant difference between the hybrid test and the common-law test articulated by the Supreme Court in *Darden.*"); *Frankel,* 987 F.2d at 90 ("We note that in practice there is little discernable difference between the hybrid test and the common law agency test."), there is essentially no reason in the case at bar for the court to attempt to mince through the esoteric distinctions between the two tests. Having traversed down this largely academic trail to garner little fruit, the court will now return to the primary issue presented by these motions.

The court concludes that the plaintiff has failed to demonstrate the existence of a genuine issue of material fact precluding summary judgment on her Title VII and KAAD claims. Although Keefer was once an employee of Prudential, the nature of that relationship was changed both contractually and factually prior to the time Thomason began working for Keefer. The facts of this case are similar, albeit not identical, to the facts of *Oestman.* Although Keefer was subject to certain restrictions imposed by Prudential, those restrictions did not transform Keefer into a Prudential employee for purposes Title VII or the KAAD. Although some of the facts identified by Thomason may suggest that Keefer and Prudential shared an employer-employee relationship, on balance, their relationship is more accurately characterized as employer-independent contractor. *See Oestman,* 958 F.2d at 306. Thomason's unilateral belief that she was a Prudential employee is not sufficient to overcome the other evidence demonstrating the inaccuracy of that mistaken belief. Nor is the court persuaded that the license applications submitted to Idaho and Arizona describing Keefer's employer as Prudential or his employment/work history with Prudential as that of an insurance agent are dispositive on the issue of his relationship with Prudential within the meaning of Title VII.

This decision is not only consistent with the Tenth Circuit's decision in *Oestman,* but it is also consistent with the vast majority of cases deciding similar issues. *See Wilde,* 15 F.3d at 106; *Deal,* 5 F.3d at 118–119 (although defendant was a State Farm insurance agent, he was not an agent within the meaning of Title VII and the ADEA); *Barnes v. Colonial Life and Acc. Ins. Co.,* 818 F.Supp. 978, 982 (N.D.Tex.1993) ("[C]ourts have consistently held insurance agents not to be employees for purposes of employment discrimination suits.").

In the alternative, Keefer argues that these claims should be dismissed against him for failure to exhaust administrative remedies. Keefer contends that at no point during Thomason's administrative pursuant of these claims before the Kansas Human Rights Commission or the EEOC was he named as a party. Thomason offers no response to this argument and no basis to excuse her from the general rules governing this issue. Consequently, the court also dismisses these claims against Keefer as uncontested. *See Parker v. Housing Authority of Kansas City, Kansas,* No. 89–2212–V, 1992 WL 81980, 1992 U.S.Dist. LEXIS 4241 (D.Kan. March 16, 1992) (a party not named in the EEOC charge is not subject to suit in a private civil action for the conduct complained of in the charge), *aff'd,* 1993 WL 207441, 1993 U.S.App. LEXIS 13799 (10th Cir. June 9, 1993); *Kansas Comm'n on Civil Rights v. Service Envelope Co.,* 233 Kan. 20, Syl. ¶ 5, 660 P.2d 549 (1983).

### Counts III and VI: The Tort of Outrage Claims[10]

■ The defendants essentially concede that Keefer's behavior was discourteous, inappropriate and unprofessional. Notwithstanding that concession, the defendants contend that Keefer's behavior was not so egregious as to satisfy the threshold requirements necessary to impose liability for the tort of outrage. While Keefer's unwelcome touchings might constitute the tort of battery, his conduct was not such to warrant liability under the tort of outrage.

Thomason responds, arguing that Keefer's conduct was wholly inappropriate and that society should not tolerate his conduct. Thomason suggests that she has produced sufficient evidence to satisfy the threshold requirements necessary to recover under each of her outrage claims.

The Kansas Supreme Court has recognized the tort of outrage or intentional infliction of emotional distress [11] as stated in the Restatement (Second) of Torts § 46(1) (1963). *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 820, 529 P.2d 104 (1974). The tort "is not a favored cause of action under Kansas law." *E.E.O.C. v. General Motors Corp.,* 713 F.Supp. 1394, 1396–97 (D.Kan.1989). "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting. *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990); [12] *see Willcox v. Boeing Military Airplane Co.,* No. 87–1015–C, 1989 WL 107728, at *6, 1989 U.S.Dist. LEXIS 11034, at *15 (D.Kan. August 23, 1989).

The Kansas Supreme Court recently discussed the tort of outrage:

"One who by extreme and outrageous conduct intentionally or recklessly causes se-

---

**10.** In light of the court's determination that Keefer was not an employee of Prudential, Prudential could not be liable to Thomason on either of her outrage claims. However, as the defendants' arguments on these claims are similar, for simplicity the court will refer to them collectively.

**11.** The torts of outrage and the intentional infliction of emotional distress are interchangeable terms for the same cause of action. *Taiwo v. Vu,* 249 Kan. 585, 586, 822 P.2d 1024 (1991); *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175 (1981).

**12.** In *Laughinghouse,* the plaintiff was subjected to constant abuse and harassment by her super-

visor over a two year period. The harassment and abuse took the form of screaming and cursing, unwanted touchings and sexual comments, fits of rage which included throwing things and tearing up files, and threats of termination. The supervisor treated the plaintiff "like an animal." Although the supervisor was abusive to many people, his treatment of the plaintiff "was unique in its constancy and severity." 754 F.Supp. at 843. Based upon "the nature of the abuse coupled with its constancy," Judge Rogers denied the defendants' motion for summary judgment on the plaintiff's outrage claim. 754 F.Supp. at 844.

vere emotional distress to another is subject to liability for such emotional distress. [Citations omitted.] Proof of four elements is required to establish the cause of action: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

"Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it."

*Taiwo v. Vu,* 249 Kan. 585, 592, 822 P.2d 1024 (1991) (quoting *Roberts,* 230 Kan. at 292–93, 637 P.2d 1175).[13]

The Supreme Court of Kansas went on to discuss the type of conduct that is extreme and outrageous enough to permit recover under the tort of outrage:

"In *Dotson v. McLaughlin,* 216 Kan. [201] at 210 [531 P.2d 1 (1975)], Mr. Justice Prager speaking for the court adopted guidelines from the Restatement of Torts. It was pointed out that recovery must depend on the facts and circumstances of each case but liability may only be found in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. It was further said liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, 'Outrageous!'

"It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society."

249 Kan. at 592–593, 822 P.2d 1024 (quoting *Roberts,* 230 Kan. at 293, 637 P.2d 1175).

In *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982), the plaintiff, an employee, was subjected to a stream of vulgar comments, racial epithets and threats of physical violence. The court of appeals concluded that summary judgment was inappropriate:

Certainly there is no occasion for the law to intervene in every case where someone's feelings are hurt. Certainly the rough edges of our society still need smoothing down and there must still be freedom to blow off harmless steam. But this vituperation was well beyond the bounds of freedom to blow off harmless steam. It is not a burden of American citizenship in the State of Kansas that such vitriolic bullying

---

**13.** In *Taiwo,* the plaintiffs filed a civil suit against the defendant alleging assault, battery, false imprisonment and intentional infliction of emotional distress. The dispute in that case did initially rise out of the employee/employer relationship. Specifically, the disagreement between Mrs. Taiwo and Vu concerned Mrs. Taiwo's final paycheck. During an argument about the amount of the final paycheck, the defendant apparently shoved Mrs. Taiwo in the chest and subsequently locked Mrs. Taiwo inside the day-care center. Vu also made false accusations to the police indicating that Mr. Taiwo had vandalized her car. Vu also instructed another employee, Sally Matthies, to tell the police that she observed the Taiwo's vandalism, when in fact she did not witness any acts of vandalism by the Taiwos. The jury returned a verdict in favor of the plaintiffs in the amount of $20,000 and the trial judge assessed $3,000 in punitive damages. The Supreme Court of Kansas affirmed the judgment of the district court.

as was turned by Hug against Gomez, and its emotional and physical consequences, must be accepted without possibility of redress and accepted as often as it amuses the speaker to utter it. Kansas courts are not so impotent. At the very least the victim of such an attack has the right to have his grievance heard by a jury of average members of the community to know whether they would exclaim. "Outrageous!"

7 Kan.App.2d at 610–11, 645 P.2d 916.

Although the court unequivocally agrees that Keefer's conduct was inappropriate, unprofessional, and has no place in the workplace, the court concludes that his treatment of Thomason may not reasonably be regarded as so extreme and outrageous as to permit recovery under the tort of outrage. As the case law makes clear, a defendant's conduct must be sufficiently egregious to clear the initial hurdle erected by the Kansas courts. Keefer's sexual harassment and other conduct, while rude and unprofessional, was not of such an abusive nature or constancy as to permit recovery under the tort of outrage. Consequently, the court is reluctantly compelled to grant the defendants' motion on the plaintiff's claims based upon the tort of outrage.

### Count V: Breach of Contract

Prudential argues that Keefer had neither actual or apparent authority to bind it to any contract to pay withholding taxes and overtime. Thomason once again argues that she believed that Keefer was her supervisor and that Keefer was an employee of Prudential with apparent authority to hire her.

The court concludes that there is insufficient evidence to demonstrate that Keefer had apparent authority to bind Prudential to any agreement that he struck with Thomason regarding the terms of her employment with him. *See Kansas City Heartland Constr. Co. v. Maggie Jones Southport Cafe, Inc.,* 250 Kan. 32, Syl. ¶ 6–7, 824 P.2d 926 (1992). Prudential is entitled to summary judgment on these claims.

IT IS THEREFORE ORDERED that Prudential's motion for summary judgment (Dk. 144) is granted.

IT IS FURTHER ORDERED that Keefer's motion for partial summary judgment (Dk. 146) is granted.

### EXHIBIT A

### The Prudential

John C. Taylor, MD, CLU, ChFC
Manager, Manpower Development and Registered Representative
Kansas City Agency
7101 College Boulevard, Suite 710
Overland Park, KS 66210
913 451-4488

February 28, 1992

To whom it may concern:

It gives me great pleasure to highly recommend Martha Thomason to a perspective employer who might be seeking an administrative assistant. During her tenure in our office I have found her to be punctual, creative, hard working and honest. Her contacts throughout the Kansas City Metropolitan area make her an asset to any business organization. She is definitely a team player and a facilitator of high morale in the office.

I have found her willing to do whatever is necessary to get the job done, no matter the sacrifice of time on her part. When asked to complete any task she has the self confidence and the initiative to get the job completed and she accomplishes this without close supervision. She works as hard when the supervisor is in the office as when they are not.

I interview prospective sales and support people in the course of my duties and I would definitely place Martha in the top ten per cent of the people I see on a day to day basis. Although I am happy to recommend her to perspective employers I am also sad to be losing such a valuable colleague. If anyone would care to discuss this matter further I would be happy to accommodate them.

Thanking you in advance for considering this special person,

I remain,

/s/ John C. Taylor

John C. Taylor