UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and Adetunji Adebayo, Plaintiffs,

v.

CATHOLIC KNIGHTS INSURANCE SOCIETY, Defendant.

No. 94 C 5744.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 16, 1996.

Jean Powers Kamp, John C. Hendrickson, United States Equal Employment Opportunity Commission, Chicago, IL, June Wallace Carson, Equal Employment Opportunity Commission, Chicago, IL, for United States Equal Employment Opportunity Commission.

Howard P. Kamin, Randall B. Gold, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, IL, for Adetunji A. Adebayo.

Barry A. Hartstein, Sidney I. Schenkier, Douglas Alan Graham, Laura A. Kaster, Jenner & Block, Chicago, IL, for Catholic Knights Insurance Society.

## OPINION AND ORDER

NORGLE, District Judge:

Are insurance agents independent contractors? The parties ask the court to answer this question for them, in the form of a motion for summary judgment. Although filed pursuant to Federal Rule of Civil Procedure 56, the answer raises the specter of Federal Rule of Civil Procedure 12(b)(1) and speaks to the existence of subject matter jurisdiction. Once questioned, it is a plaintiff's burden to establish that all jurisdictional requirements have been satisfied. *Kontos v. United States Dept. of Labor*, 826 F.2d 573, 576 (7th Cir.1987). The court responds to the question below and grants Defendant's motion for summary judgment for the reasons that follow.

## I.

Adetunji Adebayo applied to Defendant Catholic Knights Insurance Society ("Catholic Knights") to become an insurance agent. In August 1992, Catholic Knights rejected Adebayo. Plaintiff Equal Employment Opportunity Commission and Adebayo, who has intervened as Plaintiff (collectively "Plaintiffs"), contend that Catholic Knights did not hire Adebayo because of his religion in violation of Title VII of the 1964 Civil Rights Act. 42 U.S.C. §§ 2000e to 2000e–17. Catholic Knights answers that both Complaints are insufficient as a matter of law. Catholic Knights argues that the insurance agents who deal with it are not employees but independent contractors; therefore, Title VII does not apply. Plaintiffs respond that Catholic Knights demonstrated enough control over its agents so that they must be considered employees, not independent contractors.

## II.

■ As a point of clarification, the court first addresses the pertinent time periods. In responding to the motion for summary judgment, Plaintiffs begin that there are three relevant time periods: (1) the period prior to August 1992 when Catholic Knights rejected unidentified peoples because of religion; (2) the period during August 1992 when Catholic Knights rejected Adebayo because of religion; and (3) the period following August 1992 when Catholic Knights might have altered employment practices. However, the EEOC Complaint fails to plead the first period of time. The Complaint's only reference to time reads, "Since at least August 1992, Defendant has intentionally engaged in unlawful employment practices in violation of Title VII." (Compl. ¶ 7.) Even under the liberal federal notice pleading standards, that statement is too vague to allow this suit to reach all times before August 1992. Therefore, the only relevant time periods are August 1992 and thereafter.

The second preliminary issue concerns the testimony of Stephen Sheedy, former vice president of agencies for Catholic Knights.

Catholic Knights contends that his testimony is inadmissible because he was fired from the Illinois office in October 1991, well before Adebayo applied. As such, it argues, Sheedy cannot speak to the relevant period of time, *viz.* August 1992 and thereafter.

Federal Rule of Evidence 602 allows a witness to testify although that witness may not have knowledge in the literal sense. Fed.R.Evid. 602 advisory committee's note; 27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6023 (1990). Sheedy's testimony is admissible because he held a position in which he would be expected to know the amount of control Catholic Knights exhibited over the insurance agents. That Sheedy was fired and that Sheedy did not occupy the position for almost a year before the relevant time are factors that go to the weight of the evidence, not its sufficiency. Because it is not a judge's function to weigh evidence in deciding motions for summary judgement but to determine whether there is a genuine issue of fact, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), the testimony will not be excluded.

The third preliminary matter involves the pertinent documents. Plaintiffs suggest that the court ought to consider three official documents of Catholic Knights: the Full–Time Career Agent's Contract ("Contract"); the Financing Commission Agreement ("FCA"); and the Understanding of Job Status of All CKIS Agents and Job Requirements for CKIS Financed Agents ("Understanding"). Catholic Knights argues that the Understanding was discontinued in 1991, before Adebayo applied for an agent position. Plaintiffs counter that although the Understanding was allegedly no longer authorized after 1991, it is possible that those hired before 1991 were not notified that the form was discontinued. As such, Plaintiffs continue, those agents might have believed that they remained subject to the control detailed in the Understanding.

The court finds that the Understanding may not be used as evidence to support Plaintiffs' position and factual assertions. Given that the court found *supra* the period

before August 1992 is not at issue, the Understanding is not relevant. That some may have believed the Understanding was in effect after Catholic Knights discontinued the form in 1991 is speculation. Accordingly, the form is inadmissible as irrelevant, and Plaintiffs' factual assertions which used the Understanding as support are deemed improper.

The fourth preliminary matter involves arguments raised in a footnote. In its opening brief, Catholic Knights attempted to support its motion by referencing three statutory provisions in a footnote. The first involves the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb, the second and third provisions involve exceptions to Title VII, 42 U.S.C. §§ 2000e–1(a) and 2000e–2(e)(1). Although the arguments might have later proved meritorious, mere citation to affirmative defenses is not sufficient legal reasoning, and the court will not develop the arguments for Defendant. *Bakalis v. Golembeski*, 35 F.3d 318, 326 n. 8 (7th Cir.1994) (deeming an argument waived which was made only in a footnote in an opening brief).

### III.

The central issue before the court is whether an insurance agent for Catholic Knights is an independent contractor or an employee for purposes of Title VII. The parties agree that the common-law, multi-factored agency test governs independent contractor status. The analysis revolves around the principle of control. In December 1991, the Seventh Circuit Court of Appeals applied the economic realities test to a Title VII discrimination case. *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378, 380 (7th Cir.1991). There, the court affirmed the district court's finding, which followed a bench trial, that the plaintiff insurance agent was an independent contractor. *Id.* at 377. Four months later, in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–24, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992), the Supreme Court adopted the common-law agency test for defining "employee" in ERISA matters because

that statute did not define it well. The Court quoted an earlier opinion, *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 749–53, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989), which summarized both legs of the multi-factored test:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden,* 503 U.S. at 323–24, 112 S.Ct. at 1348 (footnotes omitted). Although all aspects of the relationship must be assessed with no one factor being decisive, *Darden,* 503 U.S. at 324–26, 112 S.Ct. at 1349, "Of several factors to be considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor." *Knight,* 950 F.2d at 378. The court continues, then, to discuss the factor of control.

Plaintiffs point to certain matters that they believe establish Catholic Knights' control over the agents. In their response to the motion for summary judgment, Plaintiffs argue that Catholic Knights controlled the agents by instituting the following: a dress code; mandatory meetings; specific branch and parish assignments; permission for vacations; a systemized parish marketing system; weekly sales reports of new agents; a requirement that the products of Catholic Knights could only be sold to Catholics and not to the general public, and when selling to Catholics the agents could not offer products from other companies; a minimum number of appointments, calls, referrals, and letters; the submission of call sheets by new agents; a quota of sales for Catholic Knights products; proper work habits; and a vice president once wrote that agents must give a full day's work every day and every week.

However, many of the above factual assertions were not supported properly. For instance, Plaintiffs would often fail to submit a supporting deposition page, or would rely on the Understanding (*see supra*). Plaintiffs would also suggest that measures instituted to assist a single failing agent demonstrated how Catholic Knights had control over all agents. As such, assertions that Catholic Knights required meetings, a dress code, or permission for vacations are unsupported.

In addition, the statement that Catholic Knights required all agents make a certain number of calls, referrals, and letters exceeds the evidence. The submissions of Catholic Knights show that any such requirement was directed to agents who were failing, and those pushing the failing agents made suggestions on how to improve (e.g., calls, referrals, and letters). Accordingly, the court refers only to those facts which it finds are either supported by admissible, relevant evidence, or admitted by Catholic Knights.

First, Plaintiffs suggest that Catholic Knights exhibited control over its agents in mass-marketing. It is acknowledged that Catholic Knights had a marketing system which used the mail to target parishes. The system was prepared by the Fraternal Marketing Department and was available to agents who wanted to distribute a mass-mailing to potential customers in Catholic Parishes. Those using the system could not draft their own correspondence for the mass-mailing; instead, those agents were required to use one of the seventy-six form letters already approved. (Pls.' Ex. 9A.) Second, argue Plaintiffs, Catholic Knights controlled insurance agents by way of reports on individual sales activity. Catholic Knights distributed monthly bulletins detailing the sales and commissions of individuals, it received reports from its Underwriting Department on each agent's sales activity, and again monitored each agent's sales activity by way of a

Weekly Sales Reports. Third, agents were not allowed to sell the products of Catholic Knights to non-Catholics. Similarly, although agents could sell insurance for other companies to non-Catholics, when selling to Catholics, the agents were not allowed to sell insurance from other companies. Fourth, Catholic Knights required agents to sell a certain amount of its insurance. In support, Plaintiffs indicate that agency managers had meetings with those who did not satisfy the quota. Fifth, Plaintiffs submit a letter written by a Wisconsin vice president in September 1991 in which he stated the following: "These new agents must give us a full days [sic] work every day, every week and that ... is 3 or 4 seen people and 20 phone calls. You are the key, Jim. They will do what you demand!" (Pls.' Ex. 20.)

■ Catholic Knights responds that the above assertions are inconclusive. The court agrees. There is no genuine issue of fact as to whether Catholic Knights controlled the insurance agents enough to qualify them as employees. Catholic Knights did not have the requisite control of insurance agents to constitute an employer-employee relationship.

That Catholic Knights instituted a mass-marketing program for Catholic Parishes does not demonstrate a great deal of control. Agents were not required to use the system; rather, the system was a benefit offered by Catholic Knights, available to the agents who wished to seek out new clients. It is not a strong showing of control to require that the agents who used the mailing list created by Catholic Knights to use one of seventy-six form letters. The requirement that agents submit sales reports does illustrate an amount of control. However, again, that amount of control is minimal. Because agents could sell the insurance of other companies, Catholic Knights need to ensure that agents did not neglect its products. Therefore, Catholic Knights required agents to sell a certain amount of its products. Each agent had a Commission Schedule by which the parties could gauge an agent's progress. The sales reports were a tool to assess an agent's production.

Regarding the limitations on sales, Plaintiffs correctly state that agents were restricted to selling Catholic Knights products to its members, and from selling its members insurance from other companies. However, they fail to mention, as Catholic Knights explains, that a Wisconsin statute mandates that a fraternal organization only sell its insurance to its members or potential member—it may not sell its insurance to non-members. Wis.Stat. § 614.10.[1] Furthermore, Catholic Knights did not place a limit on the sales of other companies to non-Catholics. Sheedy's affidavit contends that Catholic Knights had an unwritten policy to discourage agents from selling competing whole-life products. However, Catholic Knights submitted profile reports on many agents as an exhibit which was created by Wisconsin's Office of the Commissioner of Insurance. The profiles show that many agents sold products for other companies. Sheedy's unwritten policy did not control the agents enough to strip them of their independent contractor status.

Lastly, as noted above, Plaintiffs submit a letter containing a seemingly incriminating statement: "These new agents must give us a full days [sic] work every day, every week and that ... is 3 or 4 seen people and 20 phone calls. You are the key, Jim. They

---

1. The statute provides, in pertinent part, as follows:

    (1) Membership. A fraternal may admit any natural person to membership under such conditions and for such insurance and other benefits as its laws prescribe, subject to this chapter and other applicable laws....

    (2) Applicants authorized. Subject to s. 631.07, a fraternal may do any of the following:

    (a) In general. Provide insurance benefits to its members and, on the application of members, to others.

    (b) Children. Insure the lives or disability of children younger than the minimum age for membership in the fraternal but otherwise eligible for membership, on the application of some adult person.

    (4) Benefits pending membership. A fraternal may extend temporary or conditional insurance coverage to a nonmember who has applied for membership in the fraternal.

Wis.Stat. § 614.10.

will do what you demand!" (Pls.' Ex. 20.) However, the court will not interpret the statement literally and lose sight of the fact that, as mentioned above, Catholic Knights watched new agents in an effort to assist them—or terminate them. As part of the Contract, all agents had to sell a certain amount of Catholic Knights' products. If an agent, new or old, failed to meet a schedule of sales, Catholic Knights could terminate the relationship and the FCA. It stands to reason that new agents might fall behind more quickly than experienced agents (a situation which lends to closer watching) and, therefore, might be more susceptible to the demands of managers for Catholic Knights. The letter to "Jim" was motivational to him. He, according, to the letter, is the key to increased production by "these new agents." The letter was a "pep-talk" in the nature of the cheer "rah-rah-sis-boom-bah." The most positive inference that could be drawn for the non-movant is that the language ("They will do what you demand!") could apply both to an employee and an independent contractor, because one can demand hard work from both an employees and an independent contractors. As such, agents were encouraged, not required, to have a set number of appointments and the like to assist new agents in selling a minimum amount of products.

There are a number of other realities which exhibit Catholic Knights' lack of control over the insurance agents. The Contract specifically referred to the relationship between Catholic Knights and the agents and provided that agents were independent contractors, rather than employees of Catholic Knights:

> Agent is an independent contractor. Nothing in this contract shall be construed to create an employer-employee relationship between Society and Agent. The purpose and effect of training courses, sales methods and materials, office facilities and similar aids and services extended by Society to Agent is to assist Agent in the conduct of Agent's business and shall not give Society control or direction so Agent's time or the means or manner by which Agent conducts that business.

> Agent will be responsible for payment of all taxes, fees, and insurance related to Agent's business as an independent contractor.

(Def.'s Ex. I.) Furthermore, Plaintiffs admit that Agents did not have established times and days of work. Agents were paid on a commission basis. Agents could work from their homes or their clients' homes; they did not have to work out of an office of Catholic Knights. Agents did not have territorial limits and could contract with other insurance companies as well. Accordingly, the court finds as a matter of law that the insurance agents were independent contractors because Catholic Knights did not have the sufficient amount of control.

The remaining twelve factors the Supreme court articulated in *Darden* total in favor of Catholic Knights as well. Agents are compensated like independent contractors. Although some new agents were given advances, Catholic Knights had the right to be reimbursed under the FCA after the six month training period: "Agent expressly waives the right to first year commissions otherwise payable under paragraph 13 of the Agent's Contract as a result of sales of the Society's insurance products during the Training Period." (Def.'s Ex. I.) In addition, unlike the employees of Catholic Knights, insurance agents must pay for their own dental, casualty, liability, and disability insurance.

The court also finds the factor pertaining to taxes persuasive, fortifying the position of Catholic Knights. The insurance agents are considered independent contractors for tax purposes. Catholic Knights did not withhold federal or state income taxes from agents' checks, although it does so for its employees. Agents declare their income as self-employed on their taxes. The Internal Revenue Service, which applies the same *Darden* analysis used by the courts, has held that an insurance agent with the same job requirements as a Catholic Knights agent was an independent contractor. Priv.Ltr.Rul. 92–42–003 (July 10, 1992); *see also Mosteirin v. Commissioner of Internal Revenue,* T.C.Memo. 1995–419, 1995 WL 507584 (Aug. 28, 1995); *Feivor v. Commissioner of Internal Reve-*

*nue,* T.C.Memo. 1995–107, 1995 WL 113840 (Mar. 16, 1995).

Although Catholic Knights provided office space, access to telephones, secretarial services, and some business machines, agents were not required to use space or materials. Agents had to purchase their own business cards and stationery, and they leased personal computers from Catholic Knights at their own expense.

Lastly, that the hiring party, Catholic Knights, is in the business of selling insurance does not persuade the court to find agents were employees. An entity may hire an independent contractor to assist with its business. In the business of insurance, this is accentuated by the fact that Plaintiffs have not cited one case where an insurance agent was found to be an employee. On the contrary, since the Supreme Court issued the *Darden* opinion (indeed, even in many cases before), courts have held that insurance agents are independent contractors. *Ware v. United States,* 67 F.3d 574 (6th Cir.1995) (applying the common law of agency, the court held that the insurance agent was an independent contractor for tax purposes where the agent received extensive benefits, a paid vacation, health and dental plan, and was eligible for a 401(k) and pension plan); *Butts v. Commissioner of Internal Revenue,* 49 F.3d 713 (11th Cir.1995) (deciding, in a tax appeal, that Allstate insurance agents were independent contractors where agents received paid vacation, a pension and 401(k) plan, malpractice insurance, 75% of health insurance costs, and payment of his licensing and professional fees); *Deal v. State Farm County Mut. Ins. Co. of Texas,* 5 F.3d 117 (5th Cir.1993) (holding that a State Farm insurance agent, who owned a small independent insurance agency, was not an employee of State Farm for purposes of Title VII and the ADEA); *Oestman v. Nat'l Farmers Union Ins. Co.,* 958 F.2d 303 (10th Cir.1992) (in an ADEA case using the hybrid test decided weeks before *Darden,* finding agent to be an independent contractor where agent made own working hours, provided his own transportation, filed taxes as self-employed, and had a contract stating he was an independent contractor); *Robinson v. Bankers Life & Ca-*

*sualty Co.,* 899 F.Supp. 848 (D.N.H.1995) (applying the "economic realities" test, and finding independent contractor status where the insurance agent signed a contract which specifically defined agents as independent contractors, listed himself as such on his taxes, was paid on a commission basis, and did not have specific hours); *Thomason v. Prudential Ins. Co. of Am.,* 866 F.Supp. 1329 (D.Kan.1994) (applying the hybrid test and focusing on the amount of the employer's control over the insurance agent, the court ruled that the agent was an independent contractor even though state licensing applications listed agent as employee); *Barnes v. Colonial Life & Accident Ins. Co.,* 818 F.Supp. 978, 982 (N.D.Tex.1993) ("[C]ourts have consistently held insurance agents not to be employees for purposes of employment discrimination suits.") (Citing the following: *Dake v. Mutual of Omaha Ins. Co.,* 600 F.Supp. 63 (N.D.Ohio 1984); *Dixon v. Burman,* 593 F.Supp. 6 (N.D.Ind.1983) *aff'd mem.* 742 F.2d 1459 (7th Cir.1984); *Jenkins v. Travelers Ins. Co.,* 436 F.Supp. 950 (D.Or. 1977)); *Dutson v. Farmers Ins. Exchange,* 815 F.Supp. 349 (D.Or.1993), *aff'd mem.,* 35 F.3d 570 (9th Cir.1994).

### IV.

Accordingly, viewing the totality of the circumstances, the court finds that Catholic Knights did not control the means and manner of the agent's work, and that the insurance agent are independent contractors. For the foregoing reasons, the motion of Catholic Knights for summary judgment is granted.

IT IS SO ORDERED.