No. 69,210

BEECH AIRCRAFT CORPORATION and BEECH ACCEPTANCE CORPORATION, INC., *Appellees,* v. THE KANSAS HUMAN RIGHTS COMMISSION, *Appellant.*

(864 P.2d 1148)

Opinion filed December 10, 1993.

*Judy Fowler*, of Kansas Human Rights Commission, of Wichita, argued the cause and was on the brief for appellant.

*Terry L. Mann*, of Martin, Pringle, Oliver, Wallace & Swartz, of Wichita, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

McFARLAND, J.: This action arises under the Kansas Age Discrimination in Employment Act (K.S.A. 44-1111 *et seq.*). The Kansas Human Rights Commission (Commission) held that Beech Aircraft Corporation (Beech) and Beech Acceptance Corporation, Inc., (BACI) had violated the act in their respective terminations of Richard E. Noakes, Smith G. Laramore, and Edwin R. Hill. Beech and BACI then filed a petition for judicial review thereof in the district court pursuant to K.S.A. 44-1011(b), where the matter was heard in a bench trial de novo. The district court held in favor of the respective defendants and vacated the Commission's final order. The Commission appeals from the district court's judgment.

The four issues raised on appeal are as follows:

I. Whether the district court erred in finding that Richard E. Noakes failed to establish a prima facie case of age discrimination.

II. Whether the district court erred in finding that Smith G. Laramore failed to establish a prima facie case of age discrimination.

III. Whether the district court erred in finding that, if a prima facie case was established, Smith G. Laramore failed to prove that the reasons given by Beech for his termination were mere pretexts for discrimination.

IV. Whether the district court erred in finding that Edwin R. Hill failed to prove that the reasons given by Beech for his termination were mere pretexts for discrimination.

K.S.A. 44-1113(a)(1), at the times pertinent herein, provided:

"(a) It is an unlawful employment practice based on age to engage in any of the following acts in any manner which would limit, deprive or tend to deprive any person of employment opportunities or otherwise adversely affect the person's status as an employee or applicant for employment:

(1) For an employer, because of the age of a person, to refuse to hire or employ the person, to bar or discharge the person from employment or to otherwise discriminate against the person in compensation or in terms, conditions or privileges of employment; to limit, segregate, separate, classify or make any distinction in regards to employees because of age; *or to follow any employment procedure or practice which, in fact, results in discrimination, segregation or separation. because of age* without a valid business motive." (Emphasis supplied.)

The italicized portion of the statute was deleted in the 1988 legislative amendments to the statute, but there is no claim the amendment is material to the action herein.

At all pertinent times herein, K.S.A. 44-1112(a) contained the following definition:

"(a) 'Age' means an age of 40 or more years but less than 70 years."

Thus, for the purposes of the action herein, the protected class involves persons aged 40 to 70 years.

In *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 648 P.2d 234 (1982), we discussed the burden of proof requirements in an employment discrimination action as follows:

"[Appellant] cites *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-56, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981), a case dealing with Title VII of the Federal Civil Rights Act, 42 U.S.C. 2000e *et seq.* In the opinion Justice Powell wrote for a unanimous court:

" 'In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' *Id.*, at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate

reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.*, at 804.

" 'The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. See *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2 (1978); *id.*, at 29 (Stevens, J., dissenting). . . .

" 'The burden of establishing a prima facie case of disparate treatment is not onerous. . . . The prima facie case serves an important function in the litigation: It eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. See *Teamsters v. United States*, 431 U.S. 324, 358, and n. 44 (1977). . . . Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

" 'The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. See *Sweeney, supra*, at 25. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

" 'The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she had been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See *McDonnell Douglas*, 411 U.S. at 804-805.'

"We note the federal court was careful in *Burdine* to point out that the ultimate burden of persuading the trier of fact that the respondent intentionally discriminated against the complainant remains at all times with the

complainant. The burden of proof never shifts to the respondent. It is the burden of going forward with the evidence that is placed on defendant after plaintiff has established a prima facie case.

"Federal court decisions concerning Title VII are not controlling on this court. *Harder v. Kansas Comm'n on Civil Rights*, 225 Kan. 556, 559, 592 P.2d 456 (1979). They are persuasive authority, however. *McCabe v. Board of Johnson County Comm'rs*, 5 Kan. App. 2d 232, 235, 615 P.2d 780 (1980). Especially is this true when they concern general law in the field of civil rights. We accept and embrace the rules stated in *Burdine* as to burden of proof, prima facie case and burden of going forward with the evidence in discrimination cases.

"The burden of proof in a proceeding under the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.*, is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice. Initially, the complainant must present a prima facie case of discrimination. Then the burden of going forward with the evidence shifts to respondent and this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for respondent's conduct. Once the respondent discharges this obligation, the complainant must continue with the burden of proving by a preponderance of the evidence that the reasons offered by respondent were merely a pretext for discrimination." 231 Kan. at 766-68.

In *Kansas State Univ. v. Kansas Comm'n on Civil Rights*, 14 Kan. App. 2d 428, Syl. ¶ 7, 796 P.2d 1046, *rev. denied* 246 Kan. 767 (1990), the Court of Appeals applied these standards in an age and sex discrimination case and held that a prima facie case of employment discrimination may be established as follows:

"A prima facie case of age employment discrimination may be established by circumstantial evidence proving that: (1) an individual is a member of a protected group; (2) adverse employment action was taken against the individual, *e.g.*, discharge, demotion, or failure to hire; (3) the individual was replaced by a person outside the protected group; and (4) the individual was qualified for the position."

A modification in elements (3) and (4) may be appropriate where the individual's position is eliminated in layoffs or reductions in force. In such circumstances the plaintiff must " 'produce evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.' " *Washington v. Board of Public Utilities of Kansas City, Kansas*, 1990 W.L. 81136 (D. Kan. 1990) (quoting *Williams v. General Motors Corp.*, 656 F.2d 120, 129 [5th Cir. 1981], *cert. denied* 455 U.S. 943 [1982]).

The district court was the finder of fact herein and made extensive findings of fact. Where the district court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, Syl. ¶ 1, 855 P.2d 929 (1993). The same rule applies to a trial de novo arising from a Kansas Human Rights Commission proceeding. *Kansas State Univ. v. Kansas Comm'n on Civil Rights*, 14 Kan. App. 2d 428.

Further, a negative finding that a party did not carry its requisite burden of proof will not be disturbed on appeal absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice. *EF Hutton & Co. v. Heim*, 236 Kan. 603, 610, 694 P.2d 445 (1985); *Lostutter v. Estate of Larkin*, 235 Kan. 154, 162-63, 679 P.2d 181 (1984); *Chris Hunt Water Hauling Contractor, Inc. v. Kansas Corporation Comm'n*, 10 Kan. App. 2d 612, 617, 706 P.2d 825 (1985).

All three terminations herein were the result of the same downsizing or restructuring of the employing corporations. The circumstances leading up to the restructuring and the methods utilized in its accomplishment are complex, are common to all three individuals claiming discrimination, and were the subjects of extensive findings of fact by the district court. As the district court's findings are at the heart of all issues herein, these findings are set forth as follows:

"1. Beech Aircraft is an aircraft manufacturer with its principal place of business in Wichita, Kansas. Beech Acceptance Corporation Inc. which is a subsidiary of Beech Aircraft Corporation provides financing for purchasers of Beech Aircraft. Since 1980 both Beech Aircraft and its subsidiary Beech Acceptance Corporation Inc. have been wholly owned subsidiaries of Raytheon.

"2. In 1979 Beech Aircraft Corporation sold 1,563 aircraft. In the next decade, all general aviation manufacturers experienced a steep decline in sales. Beech's sales of aircraft dropped precipitously and in 1987 the company sold only 300 aircraft. In 1980 when Raytheon purchased Beech the company earned net income in excess of $120,000,000. In 1985 Beech had a net loss of more than $20,500,000.

"3. As a result of decreasing sales in the early 1980's there were several large scale reductions in force which resulted in a significant decrease in

the number of Beech employees. In the 6 month period between December, 1981 and June, 1982, the company reduced its work force by more than 2,500 employees. Those layoffs affected primarily employees who worked in manufacturing departments. Those employees were generally compensated on an hourly basis.

"4. On the other hand the number of salaried employees remained fairly steady throughout the reductions in force. As a result, the number of manufacturing employees was much smaller than in the past while the number of salary workers remained constant or even increased.

"5. The reductions in force did not halt the decline of profits and Beech took additional cost cutting steps such as closing its plants in Liberal, Kansas, Selma, Alabama, and Boulder, Colorado, and selling those properties. In spite of all of these efforts, the company's profits continued to decline. The company suffered a net loss in 1983, 1984, 1985 and 1986.

"6. In early 1987, James Walsh, who was then president of Beech, decided that a restructuring of the company was necessary. Beech contacted five consulting firms which specialize in the evaluation of businesses and asked each company to give a presentation outlining what it could do for Beech. One of these companies was the MAC Group which had previously performed such services for Greyhound Bus, Gulf Oil, and Schlumberger Co., and the MAC Group was hired to provide assistance with restructuring the Corporation.

"7. A team of MAC Group consultants began interviewing Beech personnel and observing operations in order to develop an understanding of the company and its problems and they were given access to all relevant information about Beech and its subsidiaries and were permitted to freely interview employees. The consultants met periodically with Jim Walsh and his staff and reported on their work.

"8. After six weeks of interviewing and observation, the MAC Group consultants [stated] that Beech would have to reduce its costs in order to continue to operate in the depressed general aviation market.

"9. The MAC Group consultants began training management personnel to perform the necessary analysis of overhead costs and the company was divided into operations, engineering, aerospace, industrial relations and controller and administration departments. Each of those departments was segmented into decision units. The decision unit manager was then charged with identifying each of the unit's functions, operations and activities. The decision unit manager was also required to document the current operations and performance of the unit, identify alternatives to the current way of performing the functions and prioritize the functions being performed. Every job function was examined.

"10. In order to determine the priority of each job function, the decision unit manager was instructed to perform an incremental analysis and to determine the most urgent need for the decision unit. In addition, each manager was instructed to specify the number of employees required by each high priority function or operation. The number of employees in the

first increment cannot exceed seventy percent of the current number of employees in the decision unit. Each successive increment was to contain those services which were next in order of priority until all personnel in the unit were included. The only job functions that were exempt from the overhead analysis in ranking were those that actually related to the manufacture of aircraft.

"11. The decision unit managers were specifically instructed to focus on job functions, not specific personnel.

"12. Within the controller's department, Jim Gray was appointed as decision unit manager for the financial analysis decision unit. At the same time, Gray was the assistant controller.

"13. After the initial ranking by the decision unit manager, the analysis was discussed with the department or division managers. The managers were asked to group each job function into one of three categories: 'must do, no discussion'; 'want to do, let's prioritize'; and 'discretionary, let's prioritize'. Next, each department or division manager discussed his or her area with the group vice president, then all vice presidents discussed their area with the president. Finally, there was a company-wide ranking.

"14. In order to determine the current functions being performed by department 87 [the financial analysis decision unit] and alternative methods for accomplishing those functions, Gray asked each of the managers and supervisors within the department to summarize, in a very detailed fashion, all the tasks and activities performed within each of the organizational units under his management.

"15. There was no discussion about the individual employees who perform the task as the objective was to identify the importance of the activity without considering who was performing the task.

"16. After determining what job functions were currently being performed, supervisors and managers reported as to how many times each month each job task was performed and what staffing was necessary to accomplish those tasks. They also suggested alternative methods for accomplishing the job task more efficiently.

"17. After defining all the tasks being performed, staffing loads necessary to perform those tasks and recommendations as to how the task could be accomplished more efficiently, Gray and his staff set about determining the priority of all the tasks. Each manager prepared an analysis of the priority of the task in their department. Each manager did an incremental analysis identifying how many employees were necessary to perform the higher priority tasks, how many additional employees were necessary to perform the second most important task and so on for each increment. In addition, each manager stated what the consequences would be if a particular increment was not funded.

"18. After receiving the incremental analysis from his manager, Gray compiled them into a decision unit overview of the whole department.

"19. Gray then prepared a decision unit increment for department 87. This document compiled each manager's level one increment. When all the

manager's level one increments were combined, it would require 50 employees to staff the increment. There were currently 71 employees in the department. The consequences of not funding the first increment would have been extremely drastic.

"20. It would have taken 9 employees to staff the department's second increment and the consequences of not doing so were much less severe.

"21. It would have taken 5 people to staff the department's third increment and the consequences of failing to fund the increment were even less serious.

"22. It would have taken 7 employees to fund the department's fourth increment and failing to staff the increment would not result in any substantial detrimental consequences.

"23. Each decision unit manager throughout the company prepared similar evaluations of his or her department.

"24. The company wide ranking took place on Saturday, July 25, 1987. On that day all of the vice presidents met with Max Bleck who had become president of Beech. In the meeting the total Beech organization was subjected to the incremental analysis in a group discussion. The vice presidents determined whether one department's first priority tasks were more or less important than those of another department.

"25. Every department was required to lay off a certain number of employees. The engineering department laid off 24.4% of its employees. The controller's department was reduced by 8.2%.

"26. Prior to determining which employees were going to be laid off, each manager was asked to find out whether there were any employees within his or her group that intended to retire soon. Beech employees are eligible for full retirement benefits at age 62 and if an employee was close to that age, the company wanted to ascertain whether the employee was actually contemplating retirement at that age of 62 or intended to continue working until a later date.

"27. On a strictly voluntary basis, Beech provided an early retirement option to employees nearing retirement age. Those employees could elect to retire and receive the same severance package as those employees who were involuntarily laid off. Depending on length of service, an employee could receive up to six months' salary and benefits. Thus, an employee . . . six months away from the date on which [he or she] could receive full benefits . . . had the option to retire early and continue to receive salary and benefits during the six months before the date [he or she] could receive full retirement benefits. Forty-seven employees opted to take early retirement.

"28. After it was determined which increments were not going to be funded, it became necessary to choose which people were going to have to be laid off. Up to this point, there had never been any discussion about specific employees.

"29. Gray had each of his managers determine how he or she would fill the jobs that had been funded. It was determined that Hill and Laramore

would be laid off. Dave Dwelley was in charge of Beech Acceptance Corporation, Inc. in the interim between the resignation of Andrew Horvath and the employment of Jim Link as president of the company. Link, Dwelley, and Joe Giardina, the Controller, determined that Noakes should be laid off.

. . . .

"47. Unlike prior layoffs, in this instance the company imposed a hiring freeze and requisitions for employees were frozen with certain minor pre-approved exceptions. The hiring freeze was implemented to avoid hiring new employees at the same time the company was attempting to restructure and downsize. It was also unique because it affected all departments within the company. Beech attempted to avoid moving employees into jobs requiring new skills. The purpose was to avoid retraining which would be costly and inefficient."

Additional findings relative to the reasons the three employees herein were selected for termination will be set forth in the discussion of the individual terminations.

The Commission contends findings No. 15 and No. 18 are clearly erroneous. We do not agree. The testimony of Controller Jim Gray supports said findings.

We turn now to the findings of fact specifically relating to the termination of the three individuals herein.

Complaint is made of the emphasized portion of Finding of Fact No. 48, which relates to all three individuals herein. That finding states:

"48. At the time of the August 7, 1987 reduction in force, Jerome Williams was supervisor-professional employment. As such, he dealt with salaried or nonexempt employees. Jim Sheldon, the manager of employment, had recently had surgery and was on medical leave and Dick Griffiths, vice president of human resources, asked Williams to coordinate the layoff. In addition to processing severance letters, severance pay and other benefits Williams was responsible for reviewing the layoff of long service employees. Williams reviewed the decisions to lay off Laramore, Noakes and Hill. *Williams received the names of the employees to be laid off on July 27 and conducted his investigation during the 11 days before layoff.* For each of the salaried employees whose layoff he was investigating, he checked to determine whether they had previously held any hourly position to which they could return and spoke to Jim Gray to determine whether there was any position available for Noakes in the finance area. He was informed that in order for Gray to take [Noakes] into his department, Gray would have to terminate a person from his department who was already doing a job they were trained to perform. Williams also reviewed the decision to lay Laramore off and was told that Laramore's performance rankings were very low and was

informed that Laramore's performance was so deficient that Laramore could have been terminated rather than laid off. Williams checked with others of the department but found that they were unwilling to [accept] Laramore in a clerical position because his computer skills were not sufficient. Williams also reviewed the decision to lay Hill off. He learned that Hill's performance rankings had been far below average." (Emphasis supplied.)

The Commission contends that the sentence "Williams received the names of the employees to be laid off on July 27 and conducted his investigation during the 11 days before layoff" is erroneous and that Williams could have had, at most, a 3½ day review period.

The finding of fact does contain an error. It was the *numbers* of employees rather than the *names* of the employees that Williams received on Monday, July 27, 1992. He received the names the week of termination.

The essence of Finding of Fact No. 48 is correct. From the time Williams received the names of the employees slated for termination, Williams particularly investigated the long-term employees to determine why the person was being terminated, if another person could be selected, and if the person could be transferred elsewhere in the company. Williams reviewed the decisions to lay off Noakes, Hill, and Laramore and reviewed the decision-making process with Jim Link, Jim Gray, and Williams' supervisor, Dick Griffiths. Griffiths asked Williams to repeat his investigation. Williams did, repeating his discussions with Link and Gray. He reported back that nothing had changed. Griffiths then personally discussed the terminations with Link and Gray and the possibilities of other employment within the company.

It is clear that Williams reviewed the decision to lay off Noakes, Hill, and Laramore, which is the substance of Finding of Fact No. 48.

There is no evidence nor any allegation before this court that if Williams had had more time to investigate the termination decisions, the outcome would have been different. Further, there is nothing in the record that a corrected finding of fact would have altered the results reached by the district court herein.

## RICHARD E. NOAKES

Noakes was one of 11 employees of BACI at the time of the August 1987 layoffs. He was 54 years old at the time. He was the manager

of international accounts and supervised the collection of accounts from aircraft purchasers located outside the United States. Fred Slaughter was the manager of domestic accounts. He was 60 years old in August 1987. Noakes' duties were assigned to Slaughter, which occupied about 10 percent of his time after Noakes' termination. The reason Slaughter could handle Noakes' duties with minimal time was that, previously, a major change had taken place relative to credit sales to overseas buyers. Jim Walsh, then president of Beech, had become concerned about delinquent foreign accounts and had imposed a requirement that all international financing be secured by a letter of credit posted by a United States bank. If an international account became delinquent, BACI had only to draw on the letter of credit.

Finding of Fact No. 34 states:

"34. Prior to 1988 salaried employees were evaluated annually by means of a salary totem. Each employee within a department was ranked in descending order of importance to the department. In addition, each manager rated the employee's performance and promotability with a la rating being the best and 5d being the worst. In the December, 1985 totem ranking there were three salaried employees in Beech Acceptance Corporation Inc. Slaughter was ranked first, Rick Parkhurst was ranked second and Noakes was ranked third of the three employees. In terms of performance Noakes was ranked 4d. The d stands for not promotable. Slaughter was rated la and Parkhurst was rated 3b. In the December, 1986 total rankings Slaughter was ranked first and Parkhurst was ranked second. Again Noakes was ranked third of the three salaried employees and he was again rated 4d with Slaughter and Parkhurst being rated la and 3b respectively."

Noakes' remaining duties were assigned to Slaughter. Slaughter is older than Noakes and in the protected class. So, Noakes contended he should have been retained and the 43-year-old Parkhurst laid off. The district court, in Finding No. 35 found that Parkhurst was retained because his performance had been better than Noakes' performance had been. Finding No. 34 supports this.

After stating the burden of proof requirements inherent in this type of litigation and how a complainant may establish the requisite prima facie showing, the district court stated:

"Using the foregoing standards, the Court has determined that the complainant Noakes has failed to establish a prima facie case. The job he held was eliminated and the performance thereunder was combined with a job

performed by Mr. Slaughter who is in fact older than Noakes and therefore is not outside the protected age group. The Court believes the principles announced by Judge Theis in providing for alteration of the prima facie case requirements under peculiar factual situations are applicable. His decision was announced in the case of *Hamilton v. Richard Cheney,* Secretary of Defense, civil action no. 84-1137-T in a memorandum and order issued June 8, 1990 and by Judge O'Connor in the case of *Washington v. Board of Public Utilities of Kansas City, Kansas,* civil action no. 88-2312-0 a memorandum and order entered on May 8, 1990 in the U.S. District Court for the District of Kansas in which Judge O'Connor pointed out that while some exception [may] be made for the prima facie requirements when it is established that the reduction in force precluded proof by the complainant that there was replacement by a younger employee, Judge O'Connor pointed out that courts have modified the fourth prima facie element by requiring the plaintiff to 'produce evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.' The Court specifically finds as a matter of law that no such evidence has been produced by the complainant Noakes in the instant case."

The Commission is challenging in this issue the district court's negative finding that Noakes had not established a prima facie case of age discrimination in his termination. The Commission had previously found discrimination as to Noakes and, under its interpretation of the evidence, urges us to reverse the district court. This we cannot do. The district court was the finder of fact in a trial de novo. When a district court reviews the proceedings of the Commission, the duty of the district court is to conduct an independent and thorough examination of the record and make independent findings of fact and conclusions of law. *Kansas State Univ. v. Kansas Comm'n on Civil Rights,* 14 Kan. App. 2d 428, 796 P.2d 1046, *rev. denied* 246 Kan. 767 (1990). We conclude there is no legal basis for reversing the district court's finding that Noakes had failed to present a prima facie case of age discrimination.

## SMITH G. LARAMORE

Laramore was 59 years old in August 1987. The trial court made the following findings of fact as to Laramore:

"36. When Laramore was hired by Beech in 1975, he was classified as a staff accountant. He worked in financial sales forecasting from 1975 until 1983. In that department he apparently did not have a good working relationship with his immediate supervisor. Laramore testified that his su-

pervisor intended to reorganize the department in 1983 and did not intend to have Laramore in the department after the reorganization. As a result Laramore asked for a transfer to the internal audit department. Laramore's supervisor in internal audit was Sam Clift who was manager of Internal Audit. While he was in internal audit, Laramore worked only on balance sheets which concerned receivables, payables and equipment and performed those duties well and Clift gave him good evaluations and recommended salary increases.

"37. When Laramore worked in internal audit Clift had suggested that he needed to learn more about the electronic data processing system and although Laramore was aware of the availability of computer training he never took the class.

"38. Clift transferred out of internal audit and Beech hired George Houston as the new manager for internal audit. Houston had retired from a career as a federal bank examiner and was 58 years old when Beech hired him to manage the internal audit department.

"39. Laramore does not have a college degree and thus could not certify audit reports. Because Coopers and Lybrand, which [audits] all Raytheon subsidiaries, required audit reports to be certified, Laramore could no longer work in the internal audit department. He transferred to cost accounting where he again worked under the supervision of Sam Clift.

"40. In cost accounting Clift wanted Laramore to work on developing a new cost out system of service stock for the parts that are available for aircraft that are already in the field. This job assignment was conceptually more difficult than the work Laramore had performed in internal audit and Clift found Laramore's performance to be inadequate in the new assignment. Clift spent quite a bit of time working with Laramore in an attempt to help him improve without success. Clift then attempted to find another position in which Laramore could perform and there was an opening in the cycle count area which was under Clift's management. Bill Androes, the group leader in that area, was apprehensive because he knew Laramore had a history of being unable to get along with his supervisors. He was, however, persuaded to take Laramore into the cycle count area and on more than one occasion he reported to Clift that Laramore was having problems performing in the cycle count area.

"41. Frank Neukirch worked in cycle count with Laramore and knew that Laramore made a lot of careless errors in his work. Part of Laramore's job was to input information on an electronic spread sheet and Androes and Neukirch hoped that Laramore would become proficient in the use of the spread sheet and would improve his accuracy. Neukirch had developed the program from the spread sheet and offered to assist Laramore in learning to use the program. Laramore never made any effort to become proficient in the use of the spread sheet.

"42. Prior to 1988 in department 87, in the totem rankings, Laramore was for example on December, 1986, ranked 23 out of 24 employees. His performance rating was 5d. Before the reduction in force of all the employees

under Clift's management, Laramore received the lowest evaluation. During the period between the evaluation and the reduction in force there was no improvement in Laramore's performance.

"43. On August 6, 1987, Kaiser informed Laramore that he was going to be laid off. Kaiser told Laramore that his performance as well as economic factors were the reasons for the layoff. The duties previously performed by him were assigned to Gene Hirsch. At the time of the reduction in force, Hirsch was 43 years old and had a bachelor's degree in accounting."

Following the district court statements relative to burden of proof and the ways a prima facie case may be established, the court then found:

"5. With respect to the complainant Laramore, the evidence is quite clear that he likewise failed to establish a prima facie case since his replacement was by Mr. Hirsch who was within the protected age group. Even if it should be held that Hirsch, 43 and therefore younger than Laramore, was in fact a younger employee and a prima facie case were to be established, it is quite clear that the reasons given by the employer for the selection of Laramore to be laid off are not suspicious or incredible but are in fact quite believable in view of the fact that Laramore was subject to being terminated for unsatisfactory performance. This Court is unwilling to penalize the employer's attempted humanity by structuring the matter as a reduction in force even though it involved a certain deviation from the truth in order to permit the most humane treatment of the employee. The Court does not believe that the law requires the employer to be as inhumane as possible at the risk of being held to account to some other standard by a subsequent reviewing administrative judge or body."

Again, the Commission seeks to substitute its interpretation of the evidence for that of the district court. Applying the previously expressed applicable appellate standards, we find no legal basis for reversing the district court in its determination that the requisite prima facie case had not been established as to Laramore, and even if such had been established, the reasons for his termination were not pretextual.

## EDWIN R. HILL

Hill was 47 in August 1987. The district court made the following findings as to Hill:

"44. Complainant Hill, throughout much of the time he was employed at Beech, owned and actively managed a construction company. His handling of the day to day affairs of that company was detrimental to his performance at Beech as he spent a good deal of time dealing with his employees and customers and occasionally left work to go to job sites.

"45. From June, 1986 until the reduction in force, Hill was supervised by John Salisbury. Salisbury also supervised Gene Hirsch during the same period. When the December, 1986 salary totem was prepared, Salisbury concluded that Hirsch had more accounting ability than did Hill and made the determination without being aware of Hill and Hirsch's respective ages.

"46. On the December, 1986 salary totem, Hill is ranked 24th of the 24 employees who were included in the totem when his performance was rated 4d. On August 6, 1987, Hill was notified that he would be laid off. The majority of Hill's work was assumed by Don Jepsen although the duties previously performed were assumed by a number of other people. At the time of the reduction in force Don Jepsen was 59 years old, twelve years older than Hill."

The Commission contends Finding of Fact No. 44 is clearly erroneous.

The record reveals that Hill admitted performing construction-related business during Beech working hours. John Salisbury, Hill's immediate supervisor, testified that Hill spent quite a considerable amount of time on the telephone for his construction business and that Hill's construction business affected his performance at Beech, but that it was not "a humongous detriment." Sam Clift, for whom Hill built a house, testified that Hill had gone out to the building site more than once during Beech work hours.

Salisbury's testimony that Hill's time spent on the phone was not a "humongous detriment" does, by implication, infer that Hill's time doing his own business *was* detrimental.

Therefore, the testimonies of Hill, Salisbury, and Clift constitute substantial competent evidence supporting the findings of fact. The trial court has the right to draw reasonable inferences from the testimony of the witnesses. Where legitimate inferences are reasonably drawn from the evidence and supported thereby, this court will refuse to interfere with the findings of the trial court upon such inferences. *Kelso v. Kelso,* 182 Kan. 665, 669, 324 P.2d 165 (1958).

After its review of the burden of proof and requisite elements to establish an age discrimination action, the district court then held:

"6. With respect to the complainant Hill, he too was not replaced by any person and therefore the Court is required to examine the circumstances of the performance of his work after his termination. The Court finds that the reasons given by the employer for his termination are credible, and are

not the subject of age discrimination, and were not a mere pretext. The Court further finds that this termination resulted in the majority of his work being assigned to Don Jepsen who was age 59 and well within the protected class."

Here, again, we are asked to adopt the Commission's interpretation of the evidence and reverse the district court. This we cannot do. The district court's findings are based upon substantial competent evidence, and no legal basis is shown for reversal of the district court.

The judgment of the district court is affirmed.