Robert S. ELKINS, Plaintiff,

v.

BAYER CONSTRUCTION COMPANY, INC., Defendant.

No. 98–1103–WEB.

United States District Court, D. Kansas.

Sept. 21, 1999.

Gary K. Albin, Render Kamas, L.C., Wichita, KS, for Plaintiff.

Derrick L. Roberson, Arthur–Green, LLP, Manhattan, KS, Terry L. Mann, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, for Defendant.

### *Memorandum and Order*

WESLEY E. BROWN, Senior District Judge.

The plaintiff alleges that his employment with the defendant was terminated on account of age, in violation of the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.) and the Kansas Age Discrimination in Employment Act (K.S.A. § 44–1111 et seq.). The matter is now before the court on the defendant's motion for summary judgment. Although the parties have requested oral argument, the material facts are clear from the record and the governing law is well-established, and the court concludes that oral argument would not assist in deciding the issues presented.

In keeping with the standards governing summary judgment, the following facts are either uncontroverted or, when controverted, are viewed in the light most favorable to the plaintiff. The following statement omits many of the immaterial assertions contained in the parties' sixty-two page statement of facts and omits factual aver-

ments that are clearly inadmissible or not properly supported by the record.

## I. *Facts.*

Plaintiff is a Caucasian male whose date of birth is March 25, 1931.

Defendant Bayer Construction Co. is a highway and earthmoving company located in Manhattan, Kansas. It has approximately one hundred employees. The president and majority owner of Bayer Construction is Burke Bayer, who is currently seventy-six years of age. Mr. Bayer characterizes his current status as "semi-retired."

Plaintiff was hired by defendant on August 15, 1986. At the time defendant hired him, plaintiff was fifty-five years of age. Plaintiff concedes that his age did not hinder his application for employment with defendant.

At the time he was hired, plaintiff was informed of defendant's policy prohibiting discrimination, and was instructed to report any complaint of alleged discrimination immediately.

Plaintiff's first position with defendant was that of equipment operator. Over the next ten years, plaintiff received several raises in his compensation.

In the fall of 1987, plaintiff was promoted to grading supervisor. At the time of the promotion, plaintiff was fifty-six years old. Plaintiff admits that his age did not prevent him from being promoted to a supervisory position. Plaintiff remained in a supervisory position from the fall of 1987 until he was terminated on January 3, 1997.

After plaintiff became a supervisor in the fall of 1987, he initially reported to Lee Stockwell, who was the general superintendent of Bayer Construction Company and the man who originally hired plaintiff. After Stockwell left around 1992, plaintiff began reporting to Stockwell's replacement, Neil Horton, and then later to Neil Horton and Kelly Briggs. Plaintiff got along well with Neil Horton, and never

had any indication that Horton was biased against plaintiff due to his age.

One of plaintiff's duties as a grading supervisor was to post signs concerning the company's prohibition of age discrimination at various work sites. Plaintiff understood that there was an internal procedure by which he or any other employee could make a complaint about discrimination.

Plaintiff's other duties as a grading supervisor included assessing what dirt grading needed to be done, instructing his subordinates regarding the completion of the grading work, keeping time for his subordinates, working with inspectors from the Kansas Department of Transportation ("KDOT"), and working with subcontractors. Plaintiff was also responsible for quality control with regard to work performed by subcontractors and for insuring that the subcontractors' work met state specifications.

In the summer of 1994, plaintiff began to report to Kelly Briggs, whose title was General Superintendent. Briggs continued to be plaintiff's supervisor from that time until plaintiff was terminated on January 3, 1997. Plaintiff also talked directly to Neil Horton, Vice President General Manager of Bayer Construction Company, in plaintiff's role as supervisor.

Plaintiff alleges that he was subjected to age-based comments during his employment. He says that in the fall of 1995 or spring of 1996, Jim Johnson, an equipment operator who was one of plaintiff's subordinates, said to plaintiff that people over 65 years of age ought not to work for the company because they would be too old to handle the work. Johnson also stated to plaintiff in the summer of 1996 that Ed Polley, another equipment operator, could not hit the ground with a blade and that anyone who was 65 years old ought to retire. Mr. Johnson repeated his opinion to plaintiff after the summer of 1996. Plaintiff made no response to Johnson on these occasions and made no complaint to management. Plaintiff acknowledges that

Johnson had no supervisory or management responsibilities at the time he made these remarks. He does contend, however, that Johnson was regarded by management as an experienced and talented operator and that they considered his opinion important in determining whether plaintiff would be able to continue at the company. According to plaintiff, Kelly Briggs told him in December of 1996 that if he could make Jim Johnson happy there would be no problem with plaintiff staying with the company. Plaintiff acknowledges that no one at a management level within the company ever held or stated the opinion that employees over age 65 ought to retire.

On approximately ten to twenty occasions after the fall of 1995 or the spring of 1996, Kenny Mayer said in reference to plaintiff, "Well, here's the old guy." Mayer is a utility supervisor; he was not plaintiff's supervisor. Mayer made such comments at the front desk in the presence of other people, although there is no evidence he made any such comments in the presence of management-level employees. Plaintiff generally made no response to Mayer. On one occasion, plaintiff put his finger to his lips and said, "Shhh," which plaintiff contends would reasonably convey that he was upset and offended by the remark. Aside from this, plaintiff never said anything to Mayer to indicate he was offended by such comments and never complained to management about such comments.

In 1996, defendant began what is known, for purposes of this lawsuit, as the Seth Childs project. This project was the largest, most complex and difficult road building project that defendant had undertaken at the time. It involved more employees, more subcontractors, working around heavy traffic and numerous intersections, and moving multiple utilities. The Seth Childs project required more than two years to complete.

When the Seth Childs project was being planned in the spring of 1996, Neil Horton asked plaintiff about his retirement plans. Horton was not aware that plaintiff had turned 65, but knew that the Seth Childs project would be at least a two-year project, and he wanted to be sure that plaintiff intended to be around to see it through. Plaintiff did not believe that Horton was encouraging him to retire or suggesting that he ought to do so. Rather, plaintiff understood that the question was related to the planning for the Seth Childs project. This meeting was motivated at least in part by the fact that Horton did not known what plaintiff's plans for retirement were.

Plaintiff told Neil Horton that he intended to continue working, and Horton said that was fine. No one had ever suggested to plaintiff that the company wanted employees to leave when they reached age 65. Plaintiff was aware that other employees continued working long after they reached age 65. In fact, one of the reasons Horton and Briggs had selected plaintiff to work on Seth Childs, rather than Mike Mayer, the other grading supervisor, was that plaintiff was more mature.

Because of the complexity of the Seth Childs project, defendant hired Matt Eichmann to serve as the project coordinator. Management intended that plaintiff and Eichmann would work together in a joint effort to accomplish the Seth Childs project. Eichmann was to coordinate the project, leaving plaintiff more time to supervise the dirt operations. According to plaintiff, Kelly Briggs or Neil Horton told him he had supervisory authority over Matt Eichmann, but according to plaintiff Eichmann appeared to believe that he was superintendent on the job.

Plaintiff and Eichmann did not work together as anticipated. Plaintiff openly discussed his displeasure with Eichmann. In the spring of 1996, Kelly Briggs spoke to plaintiff about the fact that plaintiff was going to have to do a better job of communicating with Eichmann. Briggs characterized Eichmann as "green" and told plaintiff it was going to take extra effort at communicating for Eichmann to do his job effectively. Neil Horton testified that

Eichmann came to him with a lot of questions and needed coaching, and that he spent time with Briggs and plaintiff learning different aspects of his job. Horton testified that he felt that plaintiff had misunderstood the division of job responsibilities, and that plaintiff was not too receptive to Eichmann's participation.

One day when the temperatures were in the 90's, two newly hired flaggers on the Seth Childs project had not brought the water jugs that plaintiff previously recommended. After standing for several hours in the sun, the flaggers complained to Eichmann that they had no water, and he immediately brought them water jugs. This made plaintiff mad, and there was a "shouting match" between plaintiff and Eichmann in the presence of other employees. Eichmann pointed out that the company had an obligation to provide water to employees standing on the roadside in the heat. Plaintiff was unhappy because the new flaggers had not brought their own water jugs, as he had instructed. Plaintiff testified that he stopped as often as he could when he went by with the pickup truck to give the flaggers water. Plaintiff believed that Eichmann was interfering with plaintiff's area of responsibility and it bothered him because "if we were going to furnish water jugs for two flaggers we ought to furnish water jugs for everyone on the crew." Neither Briggs, Horton or Burke Bayer ever discussed this incident with plaintiff after it occurred or reprimanded him for it.

There were other problems between plaintiff and Eichmann. Plaintiff believed that Eichmann was to serve as a "gopher" for him. Eichmann would call for plaintiff on the two-way radio, and plaintiff would not respond. Plaintiff states that he never knowingly or intentionally failed to respond to such calls. Eichmann resigned after approximately four to six months, telling management that plaintiff would not speak to him, that he was not able to do his job effectively as a result, and that he was being treated unfairly by plaintiff. Eichmann told Neil Horton that he could not get any cooperation from plaintiff, and

that plaintiff went out of his way to hinder his efforts on the project. Aside from the one conversation between Briggs and plaintiff sometime in the spring of 1996, neither Briggs, Horton nor Burke Bayer recalls specific instances of visiting with plaintiff about these concerns before Eichmann resigned.

John Young, Jr., who worked for Schwab & Eaton, a subcontractor on the Seth Childs project, reported to defendant that on occasion plaintiff did not understand the information on the stakes used to mark the various aspects of the project.

Kansas Department of Transportation inspectors worked at each job site in order to assure compliance with the state's construction requirements. Plaintiff was asking KDOT inspectors to give advice and get involved to an extent that was beyond their inspection responsibilities. Terry Grote from KDOT asked Neil Horton to take care of the problem. Horton talked to plaintiff about it and after that the situation improved enough that KDOT did not complain about it any more.

In September of 1996, Denise Keller, who is the teenage daughter of Toni Keller, defendant's office manager, was asked to prepare a memorandum about proper completion of purchase orders and to put a copy in all of the employee's payroll envelopes. When plaintiff received the memorandum, he looked at Denise Keller, wadded up his memorandum, and threw it in the trash. He said to her, "How do you like that?" Plaintiff's response brought Ms. Keller to tears. She went to her mother, Toni Keller, who complained to Neil Horton about plaintiff's behavior. Horton spoke to plaintiff about the incident and told him he "was making life hard on him [Horton] by aggravating the office help." Plaintiff offered to and did apologize to Denise and Tony Keller.

Plaintiff would refer to young employees as "kids," "college boys," or "hippies."

On one occasion Mike Hennessy, a flagger on the KDOT project, was gone from

work for two or three days attending an out-of-town function. Plaintiff informed Kelly Briggs that Hennessy had not shown up for work. When Hennessy returned, plaintiff told him there wasn't any work for him, although Briggs testified that a flagger was needed at that time. When Hennessy talked to Briggs, he told Briggs that he had informed plaintiff earlier about his plans to take this trip and that he believed plaintiff had forgotten about it. Briggs put Hennessy back to work on another crew.

Briggs and Horton had either witnessed or received reports of plaintiff using profane and derogatory language toward his subordinates. They never discussed this with plaintiff or reprimanded him for it prior to November 16, 1996.

Employees occasionally had to be relocated due to the fact that plaintiff would not work with them. One such employee was James Patrick, a flagger on the Seth Childs project.

Neil Horton was aware that employees complained that plaintiff would not set stakes for quality control, and then would be critical if the employee's setting of stakes was inaccurate. Horton had not talked to plaintiff about this problem, and does not know if plaintiff had an explanation for not setting stakes.

In September of October of 1996, Duane Krohn, the utility supervisor working on the Seth Childs project, came to Kelly Briggs and reported that things had deteriorated to the point that a change needed to be made with plaintiff. Jim Johnson, an experienced and able equipment operator, told management that plaintiff would not listen to him, would not take his suggestions, and that they were unable to communicate. Johnson said that if a change was not made he wanted to be moved to another job. This presented a problem, because Johnson was getting the heavy dirt portion of the project built. Briggs spoke to Ralph Lindgren, who was a blade operator. Lindgren said that plaintiff would not communicate with anyone on the job, and that there had to be some kind of change made. Lindgren said that he had

worked for several other companies, and that he could go find work elsewhere if a change was not made. These employees were important to the success of the Seth Childs project, and Horton and Briggs did not want to lose them.

The asphalt subcontractor on the Seth Childs project complained that plaintiff was uncooperative with them. Gary McCloud, the superintendent for the subcontractor, asked plaintiff to check to be sure that the string line denoting the grade had not been inadvertently moved. Plaintiff responded, "You're the guy getting ready to lay asphalt. You do it." Briggs and Horton did not discuss this incident with plaintiff prior to his termination. Prior to the incident, Briggs, Horton and the plaintiff had discussed the need to have the final check on the grade lines remain the responsibility of Schilling Construction so that if something was set incorrectly Schilling could not blame the defendant.

Briggs also spoke to Randy McLaughlin (or McGlaughlin), an equipment operator on the Seth Childs project. McLaughlin said that because of the way plaintiff treated people, they had no respect for his ability to run the job. According to plaintiff, he asked McLaughlin about his feelings on this and said if there was something plaintiff had done to offend him, plaintiff wanted to know so they could straighten it out. According to plaintiff, McLaughlin replied that he didn't have any problem with plaintiff.

At a meeting on or about November 15, 1996, Briggs and Horton met with plaintiff to discuss some of the concerns they had with his style of management and communications. They told plaintiff they were concerned about his use of a gruff and demeaning tone of voice when speaking to members of his crew. Neither Briggs nor Horton had brought up plaintiff's alleged decline in effectiveness until this meeting. Briggs told plaintiff at the meeting that "there was a problem," that plaintiff "wasn't getting along with personnel," and

that "the guys didn't want to work for [plaintiff]." According to plaintiff, he asked for specifics at the meeting and didn't get any. Horton testified that he and Briggs declined to give plaintiff the names of subordinates who had complained because of concern that plaintiff might retaliate against those individuals.

Following the meetings, Briggs and Horton did not perceive any improvement in the strained situation between plaintiff and his subordinates. Briggs and Horton knew that, when spring came, they would be in the second half of the Seth Childs project. They wanted to bring in a new project coordinator to replace Matt Eichmann, but were skeptical that plaintiff would work any more successfully with the replacement than he had with Eichmann. They were also worried that they would lose plaintiff's experienced crew in the middle of their largest project.

According to plaintiff, following the November 15 meeting, he went and talked to each of his employees regarding the problems Briggs and Horton had discussed with him. He spoke to Jim Johnson; Johnson "grunted" in response to plaintiff's inquiry. He talked to Ralph Lindgren, an equipment operator, who indicated he had a problem with plaintiff because he was never around. Plaintiff said he could work that out by not running equipment and by checking in more with the crew, and Lindgren agreed they could probably work that way. Allen Shelton said he didn't have a problem with plaintiff if plaintiff could be around more and check in with the crew more often, which plaintiff subsequently did. Other crew members told plaintiff they could work with him. Plaintiff then told Briggs and Horton that he had talked to his crew and could not find any individuals who would not work for him. Briggs replied that this was not the same story he was getting, and according to plaintiff said that if he could get along with Jim Johnson everything would be all right. Briggs testified that he thinks people were nervous to tell plaintiff how they really felt because of the way he treated them.

Other than Matt Eichmann, no member of plaintiff's crew quit or resigned from the time of these complaints until plaintiff's termination.

Around Christmas time of 1996, Briggs and Horton met with Burke Bayer and told him they were contemplating terminating plaintiff. Bayer was aware from Briggs and Horton of reports of dissatisfaction about plaintiff among members of his crew. Plaintiff's age never came up on the discussion regarding termination. Bayer agreed that terminating plaintiff was necessary.

On January 3, 1997, Neil Horton and Kelly Briggs terminated plaintiff's employment. The decision to terminate plaintiff was made by Horton and Briggs and was ratified by Burke Bayer. Bayer felt that hiring and firing was Briggs' and Horton's responsibility, that they were the ones in the field on a day to day basis, and that they needed he authority to make the changes necessary to get the job done.

Plaintiff has no belief that Neil Horton or Burke Bayer ever held any age-based bias. During the period of plaintiff's employment, other employees had been terminated. Some were over age 40, and some were younger than 40. Plaintiff never believed that any of those terminations were based on any discriminatory motive.

Plaintiff contends that Kelly Briggs was biased against him because of his age. Plaintiff claims that Briggs referred to him as "the old fart." According to plaintiff, Briggs called him that every time he called on the phone. Plaintiff would pick up the phone and say "hello" and Briggs would say, "Is this the old fart?" Plaintiff would respond "yes" because "he's my boss." Plaintiff testified that Briggs referred to him as "the old fart" in front of plaintiff's wife and on several occasions in the field. Plaintiff never gave Briggs any verbal or nonverbal indication that he was upset or offended by the remark. Plaintiff testified that he was offended by the term but did not complain because Briggs was his boss and he didn't want to lose his job. Plain-

tiff does not recall hearing Briggs ever use this term to refer to anyone other than plaintiff.

Plaintiff admits that, with the exception of referring to him as "the old fart," Briggs never said or did anything that indicated a bias on account of plaintiff's age. Plaintiff acknowledges that, throughout the time that Briggs was his supervisor, he never believed Briggs made any job decision based on plaintiff's or any other employee's age. According to plaintiff, Briggs got along fine with employees who were older than plaintiff, including Ed Polley and Junior Brown. Plaintiff acknowledges that he received salary increases during the time Briggs was his supervisor. Plaintiff admits that Briggs hired, promoted, and gave raises to employees in the protected age group.

Donetta Elkins, plaintiff's wife, met with Burke Bayer on the evening of plaintiff's termination. According to Mrs. Elkins, Bayer told her, "Bob has always done good work for the company.... I've never had any complaints from any job he's finished that he didn't get it done the way they wanted it and he always has made the company money." He also allegedly told her, "But the way it is, I'm trying to not have as much where I have to be involved and the younger generation now that is handling the business have different ways they are thinking and wanting to do jobs than what I did and the way your Bob wanted to do and Bob Porter." He added, "I can understand your point of being upset. You're sitting here not knowing what you do—you didn't get a chance to prepare for it [plaintiff's termination]."

Jeff Newell (DOB 3/30/63) was hired by the defendant one month after plaintiff's termination. Although plaintiff contends he was replaced by Jeff Newell, the deposition evidence cited indicates that Newell was hired to replace Matt Eichmann as project coordinator. After plaintiff was terminated, his responsibilities were assigned to a number of other employees. Jim Johnson (DOB 1/2/46) took over responsibility for the heavy grading and for timekeeping for the grading crew. Ralph Lindgren (DOB 12/24/42) took over responsibility for the finish work. Plaintiff had been a salaried supervisor. Both Johnson and Lindgren were and are paid on an hourly basis.

Plaintiff filed a complaint with the Kansas Human Rights Commission (KHRC) on April 1, 1997, alleging discrimination on the basis of his age. The complaint alleged that plaintiff was discriminated against in the terms, conditions, and privileges of employment, and that he was ultimately terminated due to his age. The complaint was jointly filed with the Equal Employment Opportunity Commission (EEOC) on April 3, 1997.

After investigation of plaintiff's administrative complaint, the KHRC concluded there was no probable cause to credit the allegations in the complaint. Plaintiff did not seek reconsideration of the KHRC decision. After receiving the KHRC's decision on or around December 30, 1997, plaintiff made a request of the EEOC on January 12, 1998, for review of plaintiff's charge. Plaintiff received a Dismissal and Notice of Suit Rights letter from the EEOC on or around January 24, 1998.

Defendant has a number of employees in their 60's and 70's, including: William Allen (DOB 10/12/34), Junior Brown (DOB 1/20/26), Louie Charpie (DOB 5/5/32), Laveryl Dittmer (DOB 8/14/37), Leroy Furey (DOB 11/12/19), David Kelley (DOB 4/4/36), Ken Knutson (DOB 9/19/37), Winifred Miller (DOB 1/22/19), Wesley Moore (DOB 4/3/23), Ed Polley (DOB 12/25/20), Robert Prockish (DOB 7/16/28), Vernon Prockish (DOB 10/10/32), Betty Reed (DOB 11/12/32), and Daney Riniker (DOB 11/10/33). In fact, defendant has been recognized and honored for its efforts toward employing older Kansans. Of the individuals mentioned above, only Riniker and Knutson are supervisors.

Kelly Briggs (DOB 11/17/59) is Vice President of Operations for Bayer Construction. He is Burke Bayer's nephew.

Neil Horton (DOB 9/17/57) is Vice President General Manager.

Defendant does not have an employee handbook or personnel manual. On one occasion, according to plaintiff, Burke Bayer told plaintiff the policy of the company was that in order to fire a member of his crew, he had to have three complaints on his work, and have the employee and plaintiff sign the complaints and put it in his personnel file. Bayer never communicated such a policy to Kelly Briggs. According to Briggs, the company policy was simply to give people an opportunity to correct whatever was wrong.

During the time that plaintiff worked as a supervisor for defendant, he never terminated or requested the termination of any employee.

Plaintiff was described by both Kelly Briggs and Neil Horton as a "good pusher," meaning plaintiff would "keep a group of people going during the course of a day, keep things happening," and that plaintiff's "intentions were to get a lot accomplished for the day in a day's time." Both Horton and Briggs considered this to be a positive characteristic. Briggs acknowledges that "good pushers" are more likely to generate complaints from their crews and subordinates. In his estimation, however, plaintiff was not getting as much done on the Seth Childs project because "there wasn't communication and cooperation between the pushers and the pushees."

Plaintiff had been Neil Horton's first choice to serve as grading supervisor when the Seth Childs job was being staffed. The project was big and complex. According to Horton, the only two real choices for the position were plaintiff and Mike Mayer, and plaintiff was kind of winding up a project when Seth Childs began while Mayer was already in the middle of one.

When asked by counsel whether a younger supervisor than plaintiff would have had an easier time handling the personalities on the job crew and the employees of the company, Burke Bayer testified that he thought they would, in part because "I think as each of us get older I think we lose some [physical and mental] energy...." He explained that this was an expanded job that had much greater responsibilities that their normal job "which certainly takes more energy and more capacity in every respect."

Plaintiff had received pay raises during his tenure at Bayer Construction. He also received bonuses in 1994, 1995 and 1996, and was never demoted by defendant. Plaintiff also received favorable comments about his work from his supervisors during his tenure at Bayer.

Jim Johnson received extra job responsibilities after plaintiff's termination. He did not officially have the title of "supervisor," but he was responsible for looking after a crew of people.

Three days after plaintiff was terminated, Kelly Briggs gave Jim Johnson the company pickup truck previously used by plaintiff. Johnson had not had a company pickup prior to that time.

## II. *Summary Judgment Standards.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

## III. *Discussion.*

The defendant makes numerous arguments in support of its motion for summary judgment. Because the court finds one of these to be determinative of the case, the remaining arguments will not be addressed. Defendant asserts that it had a legitimate, nondiscriminatory reason for its actions—namely, his treatment of the crew and his inability to get along with various people on the Seth Childs pro-

ject—and that plaintiff has no evidence this was a pretext for age discrimination. Although plaintiff argues otherwise, the court concludes plaintiff has failed to cite evidence showing the existence of a genuine issue of fact as to whether this proffered reason was a pretext. Accordingly, for the reasons discussed below, defendant is entitled to judgment as a matter of law.

■ Under the Age Discrimination in Employment Act (ADEA), it is unlawful for an employer to discharge an individual because of such individual's age. 29 U.S.C. § 623. In addressing such claims, courts ordinarily use the "burden-shifting" approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), under which the plaintiff must first establish prima facie case of employment discrimination. To establish a prima facie case of unlawful termination under the ADEA, the plaintiff must show that (1) he was within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) a younger person replaced him or he received less favorable treatment than younger employees. *Smith v. Midland Brake, Inc.,* 138 F.3d 1304, 1312 (10th Cir.1998). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant offers such a reason, the burden then reverts to the plaintiff to show the defendant's proffered reason was a pretext for discrimination. *Id.* at 804–05, 93 S.Ct. 1817.

■ Although defendant does not concede as much, the court assumes for purposes of summary judgment that plaintiff has met his burden of establishing a prima facie case of age discrimination. Because defendant's proffered reason for terminating the plaintiff in this case is a legitimate, non-discriminatory one, the burden is on the plaintiff to show that the proffered reason was a pretext.

■ A plaintiff demonstrates pretext by showing either "a discriminatory rea-son more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For example, a plaintiff may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). However, a plaintiff's "mere conjecture that [his] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

■ Plaintiff first argues pretext is shown by the fact that "many of the so-called reasons for Plaintiff's termination were gathered by Mr. Horton after Plaintiff was already terminated . . . and that [Horton] had not heard many of these alleged complaints against Plaintiff prior to that time." Pl.Resp. at 34. This is an apparent reference to a meeting or meetings after plaintiff's termination during which Horton and other employees discussed prior job incidents involving the plaintiff. Plaintiff's suggestion that this shows the defendant fabricated the asserted justification for his termination is untenable. The defendant's proffered reasons for terminating plaintiff—his treatment of the crew and his inability to get along with other persons involved in the project—were matters of record that were discussed with plaintiff over a month before his termination. The fact that employees later gave Horton further examples of the extent of these problems, some of which were unknown to Horton at the time he and Briggs terminated plaintiff, does not reasonably suggest that the defendant's asserted reason for firing plaintiff was a pretext.

■ Plaintiff also contends pretext is shown by Horton and Briggs' actions because on several occasions they failed to discuss specific problems with him, and on the occasions they did so he corrected the problem. Along the same lines, he states that the contention that he had performance problems is "contradicted and refuted by Plaintiff's interviews with individual crew members." Pl.Resp. at 34. As an initial matter, the court notes plaintiff has not shown that Horton and Briggs treated him any differently in discussing performance problems than they treated younger supervisors. As for their asserted failure to discuss problems, the record is undisputed that Briggs and Horton had a meeting with plaintiff in November of 1996 in which they discussed the matters that they say led to his termination. Plaintiff apparently contends there is a factual issue as to whether he really had a problem with the crew, but that assertion fails. First of all, plaintiff cites no testimony from any crew members (or any other evidence) to contradict the testimony of Briggs and Horton that crew members complained directly to them about plaintiff's performance and that several crew members insisted upon a change. Although plaintiff contends his interviews with the crew shows there was no significant problem, his own testimony shows that two key crew members in fact did express negative comments directly to him. Moreover, Neil Horton testified that he thought some of the crew was reluctant to express their dissatisfaction directly to plaintiff. Plaintiff cannot show pretext merely by showing that Briggs or Horton were mistaken about the extent of the problems with the crew or that things might have worked out had they given plaintiff a greater opportunity to correct the problems. The issue is whether there is evidence reasonably suggesting that they did not genuinely believe plaintiff was having serious problems with the crew. *See Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 988 (10th Cir.1996) (noting that in a pretext case it is the manager's perception of the employee's performance that is relevant, not the plaintiff's subjective evaluation of his own performance); *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 411 (7th Cir.1997) (the "pertinent question" in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual). Plaintiff has failed to show a genuine issue exists as to this fact.

■ Plaintiff also contends evidence of discrimination arises by virtue of a "longstanding pattern of derogatory and offensive age-based slurs and comments by Plaintiff's immediate supervisor, Kelly Briggs...." Pl.Resp. at 36. This refers to Briggs' frequent references to plaintiff as "the old fart." The use of this particular expression seems to be surprisingly common, and it has been addressed in numerous age discrimination cases.[1] Virtually all of these cases hold that a supervisor's use of this term, standing alone, does not imply that an adverse action taken by the supervisor was due to age discrimination. *See e.g., Bolton v. Scrivner, Inc.,* 36 F.3d 939, 944 (10th Cir.1994) (comment by supervisor that plaintiff was "old fart" did not show pretext); *Montgomery v. John Deere & Co.,* 169 F.3d 556, 560 (8th Cir. 1999) (supervisor's frequent references to plaintiff by this term did not give rise to inference of age discrimination); *Peecook v. Northwestern Nat. Ins.,* 156 F.3d 1231, 1998 WL 476245, *3 n. 5 (6th Cir.1998) (use of term not an indication of age-based animus); *Waggoner v. City of Garland, Tex.,* 987 F.2d 1160, 1166 (5th Cir.1993) (supervisor's use of term not sufficient to support a claim). These cases undoubtedly reflect the view that some degree of teasing individuals about their age is a common and accepted fact of life, and the

---

1. A Westlaw search of federal cases mentioning the terms "age discrimination" and "old fart" produced a search result of sixty cases.

For reasons not immediately apparent, a large number of the cases have originated in the Eighth Circuit.

use of such term in the workplace does not necessarily reflect an animus against older employees. *Cf. Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1553 (11th Cir. 1988) (evidence supported discrimination claim where supervisor referred to employees as "old farts," "old bastards," "little old ladies," "old cows," and declared that "everyone over 35 should be sacked"). Plaintiff cites no other evidence to suggest that Kelly Briggs had an animus against him because of age or against older employees in general; indeed, the record shows that plaintiff received positive comments and raises while Briggs was his supervisor, that plaintiff and Briggs had no problem until the Seth Childs project when members of the crew complained, and that Briggs got along well with other Bayer employees who were the same age or older than plaintiff.

Plaintiff also argues that age-based comments of Jim Johnson provide evidence of age discrimination because Johnson was consulted by Briggs and Horton in connection with their decision to terminate plaintiff. Johnson did express an animus related to age when he declared that persons over 65 were too old to handle the work and ought to retire.[2] But such comments alone cannot support plaintiff's claim. As an initial matter, there is no evidence of a connection between any such comments and plaintiff's dismissal. The decision to terminate plaintiff was not made by Johnson but was made by Briggs and Horton. Although they consulted Johnson about the situation, there is no evidence that their decision was premised on his comments or views arising from age-based animus. Moreover, Briggs and Horton consulted several individuals other than Johnson before making their deci-

sion—including Duane Krohn, Ralph Lindgren and Randy McLaughlin—all of whom confirmed there were problems with plaintiff's management of the crew. There is no evidence these other individuals had any age-based bias against plaintiff. Briggs and Horton were also aware of the previous conflict between plaintiff and Matt Eichmann that caused Eichmann to quit his job. Given the circumstances, a jury could not reasonably infer that the reasons given by Horton and Briggs for terminating plaintiff were not their true reason, but were merely a pretext for discrimination. Nor is there any other to suggest the termination was based upon age discrimination. Defendant is thus entitled to judgment as a matter of law on plaintiff's claims of unlawful age discrimination under the ADEA and the KADEA. *See Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 274, 864 P.2d 1148, 1152 (1993) (*McDonnell-Douglas* burden-shifting applies under Kansas Age Discrimination in Employment Act).

The law prohibits unlawful discrimination in employment decisions, but it does not empower the court to second-guess business judgments based upon other factors. "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir.1997).

### IV. *Conclusion.*

Plaintiff's Motion to File Surreply (Doc. 30) is GRANTED.[3] Defendant's Motion

---

2. Although plaintiff testified that Johnson made this statement on more than one occasion, the only occasion he could specifically remember indicates that Johnson was being critical of Ed Polley, and was not being critical of plaintiff's ability to work. According to plaintiff, Johnson made the statement as he and Johnson were sitting in a pickup watching Ed Polley operate a self-propelled roller

with a blade on it. At the time, Johnson did not think Polley was getting the blade close enough to the ground to distribute the dirt. *See* Def.Exh. 1 at 37–39.

3. The court will grant this motion because the defendant's reply contained objections and affidavits to which plaintiff had not had an opportunity to respond. Nevertheless, the

for Summary Judgment (Doc. 21) is hereby GRANTED. The clerk is directed to enter a judgment of dismissal in favor of defendant Bayer Construction Company and against plaintiff Robert Elkins.

court agrees with the defendant that much of the material discussed in the surreply—particularly with respect to the deposition testimony of Donetta Elkins—is either immaterial or constitutes inadmissible hearsay.